## Log Mountain Coal Co. v. Crunkleton.

(Decided October 9, 1914.)

### Appeal from Bell Circuit Court.

1. Mines—Ventilation of—Impairment of Health for Lack of Ventilation.—A coal miner, whose health is injured by failure of the mine operator to comply with section 2731 of the Kentucky Statutes, which requires every mine operator to provide an amount of ventilation of not less than one hundred cubic feet of air per minute per person employed in such mine, may recover damages for such injury.

2. Mines—Assumption of Risk—Master and Servant.—There is no assumption of risk by the laborer where the master neglects a statutory duty; the reason for the rule being that the risks assumed by the miner are only such as arise after the mine operator has discharged his statutory duties.

METCALF & JEFFRIES for appellant.

CHARLES I. DAWSON for appellee.

OPINION OF THE COURT BY JUDGE MILLER—Affirming.

The appellee Crunkleton, a coal miner, recovered a verdict and judgment for $1,000.00 against the Log Mountain Coal Company for damages to his health arising out of the failure of the coal company to properly ventilate its mine, as required by Section 2731 of the Kentucky Statutes. That statute reads as follows:

"The owner, agent or lessee of every coal mine, whether slope, shaft or drift, to which this act applies, shall provide and maintain for every such mine an amount of ventilation of not less than one hundred cubic feet of air per minute per person employed in such mine, which shall be circulated and distributed throughout the mine in such a manner as to dilute, render harmless, and expel the poisonous and noxious gases from each and every working place in the mine; and no working place shall be driven more than sixty feet in advance of a break-through or air-way; and all break-throughs or air-ways, except those last made near the working-face of the mine, shall be closed up and made air-tight by brattice, trap-doors or otherwise, so that the currents of air in circulation in the mine may sweep to the interior of the excavations where the persons employed in the mines are at work; and all mines governed by this statute shall be provided with artificial means of producing ventila-

tion, such as suction or forcing fans, exhaust steam, furnaces, or other contrivances, of such capacity and power as to produce and maintain an abundant supply of air. All mines generating fire-damp shall be kept free from standing gas, and every working place shall be carefully examined every morning with a safety lamp, by a competent person or persons, before any of the workmen are allowed to enter the mine. And at every mine operated by a shaft, there shall be provided an approved safety catch, and a sufficient cover overhead, on all cages used for lowering and hoisting persons, and at the top of every shaft, a safety gate shall be provided, and an adequate brake shall be attached to every drum or machine used in lowering or raising persons in all shafts and slopes.''

The complaint is that appellant negligently failed to supply appellee, who was a miner in appellant's service, with the quantity of fresh air required by the statute, and that his health was thereby seriously and permanently injured.

During the latter part of the year 1911 it became necessary to the proper and profitable operation of appellant's mine, to make certain changes therein. One of these changes consisted in driving a new entry from the fourth left entry in the mine, commencing near the mouth of room 25 and running diagonally toward the heads of the third left entry and the second left entry. The record speaks of this new entry as the ''diagonal''; and it was in this diagonal that Crunkleton was working, as a miner, when, as he claims, his health was injured.

In order to comply with the statute above referred to, every entry in the mine was paralleled by another entry called an air-way. The statute is based upon the fact that experience has demonstrated that every person working in a mine should have at least a hundred cubic feet of fresh air, per minute; that this quantity of air in the ordinary mine entry will not travel more than sixty feet in a horizontal direction without artificial assistance; and in order that this circulation may be stimulated, a suction fan, pulling or drawing the impure air from the mine, is placed at the portal or mouth of the air-course; and, at distances of sixty feet, an opening is cut from the entry to the air-way. The fan draws out the impure air from the air-course, and the vacuum thus created is immediately filled by the pure air entering the mine entry and crossing through the break-through.

At the end of the second sixty feet, as the entry and air-course are driven, another break-through is made, and the entrance to the last one is closed by cloth curtains, or brattices made of wood, so that the action of the fan forces the pure air to the last unclosed break-through. This system is extended throughout the mine, as the work progresses; and as a new break-through is made, the circulation through the preceding break-through is cut off or shut off in the manner above described.

The relative positions of the several entries to the main entry, and to each other, and to the air-ways, as well as the principal break-throughs that are material to this case, are shown on the following map:

X—Where Crunkleton was working.

Route of air claimed by appellant—A, B, C, D, E, F, G, H. K, L. M.

Route of air claimed by appellee—A, B, C, L, M.

The principal contention between the appellant and appellee, relates to the course of circulation of the air in the fourth left entry, and its outward passage therefrom to and through the third left entry. The pure air entered the mouth of the main entry at A; and the suction fan, revolving at the mouth of the air-course would, ordinarily, cause the pure air to travel up the main entry to the fourth left entry, thence up the fourth left entry to a point therein at room 18, which was about half-way between the mouth of the fourth left entry and the point where the diagonal entry departed from the fourth left entry. Crunkleton was working in the second diagonal. Room 18 opened into the third left entry, thus affording an outlet for air through that entry.

Appellant contends that a trap-door was built across the fourth left entry at room 18, and that the air was thereby deflected to the air-way parallel to the fourth left entry, thence up the air-way (all of the break-throughs from the air-way to the entries being closed to a point a short distance beyond where the Crunkleton diagonal left the main entry), and thence into the diagonal, where Crunkleton was at work. This line is indicated on the map by the letters, A, B, C. D, E, F, G, H, J, K, L, M. Appellee contends, however, that the trap-door was not closed across the fourth left entry at room 18; and that the fresh air made a short circuit from that point over to the third left entry and thence out to the mouth of the mine, instead of taking the more difficult course of going up the fourth left air-way, and thence into the diagonal. This line is represented on the map by the letters, A, B, C, L, M. Appellee further claims there were no brattices on the fourth left to force the air up the diagonal; that the brattices were not kept up, or break-throughs made on the diagonal as they should have been. If appellant's contention is true, the fresh air was forced into the diagonal where Crunkleton was at work; on the other hand, if the appellee's contention is true, the fresh air would not go more than half way up the fourth left entry, and would fall far short of reaching Crunkleton. The weight of the evidence supports the contention of the appellee.

Crunkleton worked in the mine all of February and the most of March, 1912. When he went to work, a portion of the diagonal entry and air-way had been driven, and he undertook to drive the remaining portion of it to

the third entry. After finishing this work in March, he did some work on the diagonal from the third left to the second left entry, and in the meantime took a position as assistant mine boss. He then left appellant's mine and went to work in another mine in Bell County, where he has since been working. On January 11th, 1913, Crunkleton filed this action for damages. The answer contained a traverse, and a plea of contributory negligence upon the part of Crunkleton.

1. For a reversal appellant first insists, that appellee has proved no injuries to himself resulting from the inhalation of impure air. The proof shows that some time before this service began, Crunkleton had been suffering from stomach trouble and had been under the care of a physician. He had applied for work in appellant's commissary department, and from this appellant infers that he was seeking lighter work on account of the condition of his health. It is also insisted that Crunkleton's earning capacity has never decreased, but has remained the same up to the present time. But as the proof upon all these contested issues was contradictory, it was for the jury to determine them. The preponderance of the proof establishes the fact that the air in the diagonal was bad.

Cole, the Assistant State Mine Inspector, heard Crunkleton's testimony; and from that narrative Cole says the conditions described by Crunkleton and his witnesses indicate a lack of ventilation and pure air. Cole further says he was in the mine on December 29, 1911; that while he was at the head of the fourth left entry his anemometer failed to show any reading; and from that fact appellee argues it is conclusively shown that in December there was no air circulating in that portion of the mine where Crunkleton claims to have been injured, and that the same conditions existed in February and March following.

Cole further testifies that in a mine insufficiently ventilated and in which dynamite and powder are used for shooting purposes, two kinds of poisons originate, one known as carbon dioxide, or black damp, the other as carbon monoxide, or white damp. Black damp (carbon dioxide) is commonly known as carbonic acid gas, and is dead air with the properties of oxygen exhausted. It is non-poisonous, but causes suffocation by excluding oxygen from the lungs. White damp (carbon monoxide)

makes one ache, dizzy, and sick at the stomach; and Crunkleton in his testimony describes his symptoms as being of this character; adding that he has grown nervous and weak, and has lost considerable flesh.

Furthermore, according to the testimony of Drs. Wilson and Combs, carbon monoxide or white damp has the effect of destroying the hemoglobin of the red corpuscles of the blood, which is the oxygen carrying property of the blood; and that if a person is deprived of a sufficient quantity of oxygen it results in a worn out, debilitated, and weakened condition of the system. Dr. Combs further testified that in his examination and treatment of Crunkleton, he found him in an anaemic condition; that his blood was lacking in coloring matter; that he prescribed a treatment calculated to build up the hemoglobin of the blood. Dr. Combs further testified that he examined appellee's heart, kidneys and lungs, and found nothing organically wrong with any of them; and from this it is argued that since Crunkleton has no organic trouble, his debility must have resulted from the bad air in the mine.

While it is true a plaintiff must show that his injuries are the proximate result of the defendant's negligence, it is at once apparent that it is necessarily difficult to clearly establish a direct connection between injuries of the character now afflicting appellee and so insidious a cause as impure air. We think, however, there was sufficient evidence sustaining plaintiff's claim to take the case to the jury upon that issue; and we are not inclined to disturb the verdict.

2. Appellant further contends that if the air was bad Crunkleton knew it, and he was charged with knowledge of all the results that might follow from breathing it. In support of this contention appellant relies upon Thayer v. Kitchen, 145 Ky., 554, where we said that the youth, ignorance or inexperience of the servant would excuse him from blame for working in the air that he knows to be bad. But as Crunkleton was twenty-eight years of age, with nine years' experience as a miner, and a man of more than average education and intelligence, it is insisted that these qualifications negative his bare statement that he did not know the effect of the impure air upon him by continuing to work in the mine.

In substance, this is a plea of assumed risk which has no proper place in an action based upon the defendant's failure to perform a statutory duty.

This question was before the court in Low v. Clear Creek Coal Co., 140 Ky., 758; Ann. Cas. 1912 B., 575, where we said:.

"If the statute be so construed as to impose on the miners the consequences of the situation if they should be injured, then the wholesome benefit of the legislation is lost. On the other hand, if it be so construed as to let the miner shut his eyes to obvious and imminent dangers, it would carry the statute to an unreasonable length and place a premium on sheer recklessness. We think the safe rule is to hold that unless the danger from the lack of props is not only imminent, but so obvious that an ordinarily careful man would not have worked under the conditions, the owner has the responsibility. He having failed in his statutory duty, the liability for all consequences is upon him, unless the miner could see, or know, by ordinary care, that the situation was dangerous and imminently so. In other words, there is no assumption of risk by the laborer where the master neglects a statutory duty. But such laborer is still liable for his contributory negligence. The two propositions are not identical. To constitute contributory negligence there must be some act or failure on the part of the laborer, in addition to the ordinary risks imposed by the character of his work under the conditions created by the master's conduct, which would amount to culpable negligence on the laborer's part. Such, for example, as a failure to look, to observe, to test in some way, the safety of the roof in this instance; or, if it had been unsafe, and obviously so, and the danger thereby imminent, his continuing to work under those conditions. (Johnson v. Mammoth Vein Coal Co., 114 S. W., 722, 19 L. R. A. (N. S.), 646; Mammoth Vein Coal Co. v. Johnson, 127 S. W., 971, 94 Ark., 621.)"

The reason for the rule is that the risks assumed by the miner are only such as arise after the mine operator has discharged his statutory duties. Miami Coal Co. v. Kane, 45 Ind., App., 391, 90 N. E., 13; Williams Coal Co. v. Cooper, 138 Ky., 287.

The rights of appellant under its defense of contributory negligence were fully covered by the second instruction which directed a verdict for the defendant, if the plaintiff knew, or by the exercise of ordinary care could have known, of the foul, noxious or polluted condition of the air, or that to continue in said work would

endanger his health. Appellant cannot complain of this instruction; it gave appellant all, and more, than it was entitled to.

3. Finally, appellant insists that since Crunkleton drove the entry from seventy-five to eighty feet ahead of the air-way which another person was driving on a parallel, appellee was guilty of an act from which the injury resulted, and that he cannot recover for that reason. In support of this contention appellant points out that it was physically impossible to make a break-through from the diagonal until the air-way was up to the point opposite that entry. It must not be forgotten, however, that the entire management of the mine was under appellant's control, and that it was appellant's duty—not appellee's—to make the air-way. This branch of the defense, therefore, resolves itself into a plea of assumed risk, which, as we have seen, has no place here.

Judgment affirmed.