## Consolidation Coal Company v. Hamilton.

(Decided May 25, 1916.)

### Appeal from Johnson Circuit Court.

1. **Master and Servant—Assumption of Risk.**—Where the master or some one acting for him promises to remedy a defective machine complained of, the servant by continuing in his employment for a reasonable time after such promise, does not assume the risk of injury from the defect, unless the danger was so patent that no person of ordinary prudence would have continued to work.

2. **Master and Servant—Assumption of Risk.**—Where a promise to repair a defective machine is not confined to a specified time, the servant may continue to work on the faith of the promise for a reasonable time thereafter without assuming the risk; but if he continues to work with the defective machine beyond a reasonable time after the promise to repair was made, he assumes the risk incident thereto.

3. **Master and Servant.—Defective Machinery.**—In order for a servant to be protected by the promise of the master to repair a defective machine the servant must have been induced by the assurance or promise to continue in the employment.

4. **Master and Servant—Assumption of Risk.**—Where an experienced miner was thoroughly familiar with a coal cutting machine which was defective, and worked with it for six weeks knowing it to be defective, he assumed the risk incident to its operation.

O'REAR & WILLIAMS, FOGG & KIRK and H. S. HOWES for appellant.

ROSCOE VANOVER and REYNOLDS & STEELE for appellee.

Opinion of the Court by Chief Justice Miller—Reversing.

This appeal is from a verdict and judgment awarding the appellee $1,250.00 in damages for personal injuries received while operating a coal cutting machine in appellant's mine, at Van Lear, Ky.

The petition alleged that while the appellee was working in appellant's mine on January 9th, 1914, appellant, through gross negligence and carelessness furnished appellee with a coal cutting machine which had a defective clutch, and that by reason of the defective clutch giving away, plaintiff's right leg was broken and his other leg very severely injured, bruised and mangled; that his injuries are permanent, and caused plaintiff much mental and physical pain and suffering, and have permanently impaired his power to labor and earn money.

The petition further alleged that the clutch was known to the appellee to be defective before he was injured, but that he did not know of the dangers incident to using the machine with a defective clutch; that the appellant knew the clutch was defective and the dangers incident to using the machine with the defective clutch before the injuries were inflicted, and in time to have prevented injury to the plaintiff; that appellee continued to work with the defective machine under a promise of appellant to repair same; and, that he was injured while continuing his work and awaiting said repairs, and without any knowledge of the dangers incident to using the defective machine.

The answer contained a traverse of the allegations of the petition, and a plea of contributory negligence.

The proof showed that Hamilton was 30 years of age at the time he was injured, and that he had been a coal miner for 18 years, doing all kinds of work in the mine. He had had five or six years' experience in operating coal cutting machines, and about two years' experience in operating the type of machine by which he was injured, which was known as a short wall Jeffrey machine. He had been working with this machine from November 23rd, 1913, until January 9th, 1914, the date of the accident.

The day after he began working with it he notified appellant's electrician that the machine needed repairs; and occasionally thereafter during the six weeks he

operated the machine he continued to notify the electrician that the machine needed repairs. The repairs were never made.

In operating the machine a forked jack was used for the purpose of getting the machine in place and started in cutting the coal. The jack was set on the right hand side of the machine, near the face of the coal, and in a slanting position, between the roof and floor of the mine. The jack was attached to the machine by a rope placed around the jack near its lower end, so that when the machine began to cut, the rope would pull against the jack and tighten it. The jack had a screw in it for the purpose of lengthening or shortening it. The forked end of the jack usually rested against the roof of the mine and would fit into a small hole dug into the roof by the miner. It was customary to make this hole in the roof, insert the forked end of the jack into it and tighten the jack to make it secure. The trouble with the machine in question was, that the shifting clutch was worn and would sometimes fly off and release the feed of the machine so that it would not cut the coal.

On the occasion in question when Hamilton was injured, no hole had been made in the roof for the forked end of the jack, and it had not been tightened by means of the screw provided for that purpose.

Hamilton's helper placed the jack in position and held it until the machine began to run, when he pulled on the rope, tightening it. The defective clutch flew off, the feed on the machine was released, with a consequent release of the tension of the rope on the jack. This caused the jack to become loose and fall; and, in falling it caught in the moving bits of the machine and caused the machine to move around and catch appellee's leg between it and the coal, breaking one of the bones.

Appellant insists that its motion for a peremptory instruction should have been sustained. The argument for appellant is that Hamilton knew of the defective condition of the machine; and, although he asked appellant to repair it, he does not show that appellant's promise to repair the machine induced him to continue using it in its defective condition.

In testifying, Hamilton admitted the machine was in bad order when he began working with it. He further said its shifting clutch was worn out and would not

hold, but would fly off whenever the pressure against it was removed; that he complained repeatedly to the electrician and the mine boss about the condition of the clutch, and that the mine boss repeatedly promised to repair it, but had as often failed to do so because the company did not then have the necessary repairs in stock. Hamilton further said the mine boss promised to take up the matter of repairs with the superintendent; that he said they would have to get along the best they could until the company could get the parts necessary to repair the machine; and, that this was substantially the same answer that was given to Hamilton every time he complained.

There was no promise or assurance given to Hamilton that the repairs would be made by a specified time; neither does it appear that he was induced by the assurance or promise to continue in the work.

The appellee's rights under this state of facts were well stated by this court in American Tobacco Co. v, Adams, 137 Ky. 422, as follows:

"As we understand the rules in reference to the protection of the servant when he continues in an employment after he has called the attention of the master to the fact that the premises or appliances are defective or unsafe, and has an assurance that they will be repaired, they may be summarized generally as follows: (1) If the place is intrinsically dangerous or if the appliances or implements to be used require skill or care in handling to prevent accident or injury, the servant may depend upon the assurance of the master to repair; but if the place is not intrinsically dangerous to work in or about, and the appliances or implements in use are simple in character and those used in ordinary employments, and such as do not require any particular care or skill to operate or handle, the promise of the master to repair will not render him liable if he fails to do so; (2) the servant must have been induced by the assurance or promise to continue in the employment; (3) if the promise or assurance is that the repair will be made by a specified time, the servant may continue to work on the faith of it until the time specified; and, if no time is fixed when the repairs are to be made, then the servant has the right to assume that they will be made within a reasonable time, and will be protected by the assurance for such time; (4) if the promise or assurance is

made to repair or remedy a condition or situation that is so obviously dangerous that a person of reasonable prudence and ordinary intelligence would understand and appreciate the peril arising from the defective condition, then the servant will not be justified in continuing in the employment on the faith of the assurance or promise, and the master will not be liable on this ground if he does; (5) the complaint of the defective premises or appliances must be brought to the attention of, and the assurance given by, a person superior in authority to the servant making the complaint.''

The same rule is stated in 26 Cyc. 1209, *et seq.*, as follows:

''Where the master or some one acting in his place, promises to remedy the defect complained of, the servant by continuing in his employment for a reasonable time after such promise does not assume the risk of injury from the defect unless the danger was so patent that no person of ordinary prudence would have continued to work. This rule does not apply in the case of ordinary labor with common implements with which the servant is perfectly familiar, or where neither the master nor the servant contemplates any increased danger to the latter from the continued use of the defective appliance. Nor does the master's promise relieve the servant from the duty of exercising such care as is reasonably commensurate with the danger complained of, and where the promise is to repair after the completion of the work on hand, the servant assumes the risk of injury until such time by continuing at work.

''Where the danger is so obvious and imminent that no prudent person would undertake to perform the service, the servant is not justified in continuing in the performance of his services and assumes the risk of any injury which he may sustain; and where neither the master nor the servant contemplates any additional danger to the servant in the use of the defective instrument, the servant assumes the risk of injury notwithstanding the master's promise to repair.''

And, as to what is a sufficient promise in such cases, the same author says:

''To be sufficient, a promise by the master to remedy defects or remove danger must be definite and certain, and must be made with a view to the servant's safety, and as an inducement to him to continue work. The

promise may, however, be implied as well as express, general as well as individual.''

The foregoing rule is fully sustained by the opinions of this court in Bell & Coggshall Co. v. Applegate, 23 Ky. L. R. 470, 62 S. W. 1124; Republic Iron & Steel Works v. Gregg, 24 Ky. L. R. 1467, 71 S. W. 900; Louisville Hotel Co. v. Kaltenbrun, 26 Ky. L. R. 669, 82 S. W. 378; Brown v. Levy, 108 Ky. 163; Reiser v. Southern Planing Mill Co., 114 Ky. 1; Shemwell v. Owensboro & Nashville R. R. Co., 117 Ky. 556, and other cases.

Turning now to the proof, we find Hamilton testifying as follows:

"Q. Who was it that gave you, or directed you to work this particular machine? A. The mine boss. Q. Do you know whether or not you called his attention to the fact that the clutch was worn? A. I did and showed him how the machine worked. Q. Then as I understand you, you called the attention of the very man who assigned you this machine to the fact that the clutch was not right? A. Yes, sir. Q. Tell what he said, if anything? A. I first asked the electrician, the first day I went to cut, on the 23rd of November; and the first day I came out, he asked how I liked it, and I said it was all right but it needed some repairs; and he asked me what, and I told him the best I could. He said, 'we have not any repairs in stock now. This is the only machine of the kind we have and we have it on trial, and we have not ordered any for it. We have not gotten results with the machine yet; and if we do, we will order repairs, but I will take the matter up with the superintendent and have him order this clutch and some other things.' And the superintendent said, 'we would get along the best we could until we could get the stuff to repair it.' * * * Q. Now, the time you spoke about a while ago calling the electrician's attention to that clutch; was that the only time you called his attention? A. No, I called it several times. About every time I was in the supply house, I would ask if they had the supplies yet, or were they looking to get them anyways soon, and they always said they did not have them. Q. Did he ever tell you at any time that he was not going to repair it? A. No, he said he did not have anything to fix it with. Q. Did he make you any promise? Tell what he said. A. He said they would fix it when they got their stuff. That they positively could not do anything with it until they

got it. Q. What experience had you had in running a coal cutting machine? A. Five or six years. Q. You may state whether or not you had operated this character of machine? A. This machine was a little bit different from any I ever operated, but it was practically the same thing. It was the same type and all, but was a little bit different in the working of it.     *     *     *  Q. You were thoroughly familiar with the workings of this kind of machine? A. Yes, sir. Q. You knew practically all about its parts and connections? A. Yes, practically all about the connections of the machine?     *     *     *  Q. You told the jury about having conversation with an electrician, now who was that electrician? A. Leonard Smith and Billie—I can't think of his name now. Q. They asked you how you liked the machine? A. Yes, sir. Q. What did you say? A. I told them all right, but it needed some repairs. Q. Was that the first day after you worked with the machine that you had that conversation? A. To the best of my knowledge it was. Q. After that time you continued to work with this machine until you were injured? A. Yes, sir. Q. During that time it was out of repair and you knew it every day? A. Yes, sir. Q. And occasionally you would call the attention of the electrician to its being out of repair? A. Yes, and he told me he could not repair it; that he had nothing in. Q. He said he had no material with which to repair it? A. Yes, sir. Q. The electrician told you he would see the superintendent and have him order some fixtures to repair it with? A. Yes, sir. Q. Every time you mentioned it, he would still tell you he had no materials to repair it with? A. Yes, sir. Q. You went on and used the machine while it was out of repair? A. Yes, sir. Q. And on the day you were injured, it was still out of repair? A. Yes, sir."

This proof shows that Hamilton has failed in at least two respects to bring himself within the rule formulated in American Tobacco Co. v. Adams, *supra,* in order to recover. There was no promise to repair within a specified time, and he continued to work with the defective machine for fully six weeks, which was more than a reasonable time in which to make the repairs. Plowman Construction Co. v. Garrison's Admr., 157 Ky. 466. Under the facts as shown by Hamilton's own testimony, he had no right to continue working with the defective machine upon the faith that it would be

repaired. The promise to repair, if it may be so treated, having remained unfulfilled for more than a reasonable time, Hamilton had assumed the risk at the time he was injured. Phoenix Jellico Coal Co. v. Robinson, 148 Ky. 29.

Moreover, it is apparent from Hamilton's testimony that the promise to repair the machine, did not induce him to continue working. He was an experienced miner and understood the machine perfectly; indeed, it appears that he understood it better than any other person who testified. The distinction he would make by saying he knew the defects of the machine but did not know the dangers incident to its operation, is more fanciful than meritorious. When one thoroughly understands a machine and how to operate it, it will be presumed he understands the dangers incident to its operation. We think it plain from Hamilton's own testimony that instead of relying upon the vague promises and procrastinations of appellant's servants in the matter of making repairs as an inducement to continue working, he relied upon his own superior knowledge and continued to work for more than six weeks. Whatever risk there was, he knew it; and, under the facts of this case, he assumed it.

The defendant's motion for a peremptory instruction should have been sustained.

Judgment reversed.