## Louisville & Nashville Railroad Company v. Gilliland.

(Decided June 7, 1927.)

### Appeal from Hopkins Circuit Court.

1. Master and Servant.—In employee's action for injuries, alleged to have been received as result of inhaling fumes from certain disinfectants, evidence that employee was required to use formalin in disinfecting railroad coaches held sufficient for jury.

2. Master and Servant.—In action by employee for injuries, alleged to have been received as result of inhaling fumes from certain disinfectants, evidence relative to injury to eyes resulting from use of formalin in disinfecting railroad coaches held for jury.

3. Master and Servant.—If fumigants used by employee in fumigating railroad coaches actually caused injury to eyes as claimed by employee, court could not say, as matter of law, that such fumigants were noninjurious.

4. Master and Servant.—Illiterate employee, knowing nothing of chemical gases and result and effect of fumigants, held entitled to rely on statement of foreman that fumigant which he was required to use in fumigating railroad coaches was not poisonous, and his continuance to work after assurance to such effect did not constitute contributory negligence.

5. Master and Servant.—Where servant conscious of discomfort, but unaware of danger in reference to use of chemical gases in place of work, is assured that they are harmless, this is a continuing assurance of existing fact and not promise to remedy defect.

WOODWARD, WARFIELD & HOBSON, ASHBY M. WARREN and C. J. WADDILL for appellant.

FOX & GORDON for appellee.

OPINION OF THE COURT BY JUDGE McCANDLESS— Affirming.

Ras P. Gilliland recovered a judgment against the Louisville & Nashville Railroad Company for $3,675.00 for personal injuries which it is alleged he received as a result of inhaling fumes from certain disinfectants while engaged in cleaning passenger coaches at Earlington, Ky. Defendant appeals. The principal contention is that the

court erred in failing to give a directed verdict, a motion for which was made at the close of appellant's evidence and again at the close of all the evidence,

Appellee did various kinds of work for appellant during a period from November, 1922, until the last of February, 1925. A part of this time he was engaged as a coach cleaner; his duty consisting of cleaning the lamps and headlights at the top of two passenger coaches. He also swept and dusted. He performed this duty regularly from the time he entered appellee's service until March, 1923, and irregularly thereafter, though for about three months prior to February, 1925, one-half his time was occupied by this kind of labor, the coaches being brought over from Morganfield in the morning and laying over until 12 o'clock.

Appellee testified that formalin is carried in the stock of supplies at Earlington in labeled jugs, and used in the fumigation of these coaches; that he has frequently seen a negro porter named Dad Gardner, under instructions from appellant's foreman, pour formalin in a bucket of warm water, and mop the floor and baseboard of the toilet and the heating pipes on each side of the coach; that the gas and fumes from the formalin would rise and burn his eyes, nose, and throat, and he could feel it in his lungs; this was unpleasant, but he knew nothing of chemicals and did not know that it was poisonous or that it would poison or injure his system in any way. He reported this fact to his superior officer, J. T. Malone, on two different occasions; at one time in the presence of another witness. On both occasions the foreman told him that the preparation was not poisonous and to continue at work.

Henry Scholtz, who at times mopped the coaches, stated that both formaldehyde and creosolum were used at Earlington; that the man who did the mopping mixed the preparation; that he never made his too strong, but that the old negro Gardner got it too strong; he would pick up the five gallon can and pour maybe a quart in it, and that he (witness) told him that he was getting it too strong, that he did not think Gilliland ever used it or fumigated any; that he was attending to the lamps.

Roy Stultz testified that he was a car inspector and frequently in the cars where Gilliland was at work, that formaldehyde was used for fumigating; and that on one

occasion while unstopping a drain pipe the foreman cautioned him not to get any formaldehyde on his hands if they had sores upon them.

Verb Arnold, a car repairer and coach cleaner, states that he cleaned these coaches, quitting in 1924; that the negro Gardner used formaldehyde in the coaches, and it burned your eyes, nose, and throat, but he worked for the most part in the summer when the windows were up. He states that Mr. Malone, the foreman, on one occasion sprinkled formaldehyde in the supply room, and that it burned his eyes, nose, and throat. Appellant further claims that during the last few months of his service the windows were closed while he was at work; that about the 25th of February he was suffering from his eyes, nose, and throat, and had kernels in the lymphatic glands; that he informed the foreman, who advised him to see Dr. Bailey, a specialist, at Madisonville. Dr. Bailey was not in and Dr. Strother prescribed a purgative for him; he resumed outdoor work for a day or two and went back to see Dr. Bailey; at that time he was almost blind and suffering severely. Dr. Bailey corroborates this, and says that his condition was caused by some toxic substance in his system; he put him in hot packs, i. e., wrapped him in blankets wrung out of hot water and gave him purgatives to eliminate the poisons; this was continued at the hospital for a week or ten days and later at his home; he found no trouble with the patient's throat or tonsils; his eye trouble is what is called acute retrobulbar neuritis; that neuritis is an inflammation, not an infection of the nerve, and is followed by atrophy; it may be occasioned by any poison in the system, by infection from scarlet fever, diphtheria, infection of the mucous membranes of the tonsils, teeth, nasal accessories, and the use of alcohol and lead or various other chemicals. However, a Wassermann test was applied and demonstrated that appellee did not have syphilis and he could discover nothing wrong with his sinuses, teeth, tonsils, or urine. In his opinion his condition was not caused by local application to the external eye, "but by something carried into the system either through ingestion, swallowed into the stomach, or breathed into the respiratory tract."

Dr. A. F. Clements, an eye, ear, nose, and throat specialist, examined appellee on December 7, 1925, and October 6, 1926. It was his opinion that appellee had optic atrophy; that optic atrophy usually follows some poison

or toxic substance, and that appellee's condition was due to some poison. In answer to hypothetical questions he says that in his opinion the condition of appellee's eyes could have been caused either by direct action of the formalin gases or indirectly by breathing the poison fumes.

Dr. Beasley, an eye and nose specialist of Hopkinsville, corroborates Dr. Clements. On cross-examination he was asked:

"Q. In your opinion, would a long standing infection of the sinus, or of the teeth, or of the tonsils, produce more or less toxic effect than that of inhalation of the fumes of formaldehyde? A. I believe the fumes of formaldehyde would be the greatest intoxicant; it would act more powerfully and quicker.

"Q. To what extent would the fumes have to be inhaled to produce the effect? A. Constant amounts of even small quantities.

"Q. Covering what length of time? A. Maybe weeks or months.

"Q. How many months? A. Might be weeks or months; depends on the amount inhaled."

Formalin is a 40 per cent. acqueous solution of formaldehyde, and is a derivative of wood or methyl alcohol. When subjected to certain chemical reactions it gives off formaldehyde gas, which is extremely irritating to the eyes, nose, and throat, and admittedly highly poisonous.

Appellant claims that the coaches mentioned remained over night at Morganfield. They were there fumigated once in ten days with a preparation of formalin, the formula being two and one-half pints of formalin, six pounds of lime, three-fourths of a pint of alum water, the mixture being put in a three-gallon container without water. The doors and windows of the coach to be disinfected were closed and the container left therein. The fumes produced by the chemical action of the mixture permeated the atmosphere of the coach and produced the desired result. In the morning after the fumigation the coaches were used in regular passenger travel to Earlington and left there from 8 until 11 o'clock. They were there mopped and cleaned, but in doing this no formalin or formaldehyde was ever used. Instead it used creosolum. This is a brown liquid put up in three-gallon jars

which upon being dissolved in water turns to a milky color and gives off certain fumes and was used as described by appellee and his witnesses. This testimony was given by a number of employees. It is also shown by chemists that creosolum is a coal tar derivative, is nonpoisonous, and is helpful rather than injurious to health. Its witnesses show that appellant has been using this preparation for 20 years without any injurious result and has had no complaint theretofore prior to this. Appellant's foreman denies that appellee complained to him of the use of the fumigants, or that he informed him that they were nonpoisonous. It also introduced Dr. Cullum and Dr. Radvin, specialists of standing, who say that in their opinion it is not possible for acute retrobulbar neu- ritis to be caused by local contact with formalin without producing some serious or permanent injury to the conjunctiva, a condition not present in this case; that they have never known nor heard of a case of neuritis being caused by formalin; and that they think the condition is due to some infection from bacteria inside the body. It is also shown that in the summer after appellee's recovery he applied again for labor, which could not be furnished, and thereafter he filed suit.

Appellant insists that it was entitled to a peremptory instruction for a number of reasons which we will consider in their order. (1) It is said that the method of fumigation described by appellee's witness applies to the use of creosolum not formalin, and therefore the preparation referred to by them must have been creosolum, which is consistent with appellant's evidence, and creosolum is shown to be harmless. The answer to this is that the articles described by appellee and his witnesses are similar to formalin. The immediate effect described by them is similar to that produced by formalin. Their testimony is that it was put up in jugs labeled formalin, and a bottle of formalin was introduced on the trial, and the liquid identified as being similar to that used in the fumigation. Certainly there was a conflict of evidence on this point.

It is next urged that the condition of appellee's eyes and the cause of that condition is a question to be determined by medical science. If it be assumed that formalin was used, as its witnesses testify positively that such conditions could be produced only by bacterial infection, and

appellee's witness admitted that bacterial infection could produce such a condition, the jury should not have been permitted to speculate upon this question. It is true that appellee's witnesses make the admission stated, but they also say that his condition could have been produced by formalin fumes, and further say that the troubles that usually produce bacterial infection were absent in his case. Dr. Beasley further testifies that in his opinion the fumes of formaldehyde would act more powerfully and quicker than bacterial infection, and Dr. Bailey states unqualifiedly that in his opinion the condition was caused by something being carried into the system through ingestion either by swallowing or by breathing. The evidence being thus conflicting as to the proximate cause of his condition, this question was properly one for the jury. It is next said that, if appellee's trouble was not caused by bacteria and could be traced to the fumigants, it must be on account of some physical idiosyncrasy, as the proof is conclusive that creosolum is not injurious to a normal person, and that it has been using these fumigants for 20 years without complaint from any one. This being true, appellant was not required to anticipate the effect it would produce on one abnormally susceptible to it. This argument presupposes the use of creosolum instead of formalin. We have seen that there was sufficient evidence to authorize a submission of that question to the jury. Independent of that, if the fumigants used by appellant actually produced the results claimed by appellee, the court could not, as a matter of law, say that they were non-injurious.

It is said, however, that appellant was guilty of contributory negligence in continuing to labor after he learned of the disagreeable effect of the fumigants; that he knew how he was affected better than any one else did, and the trouble was so obvious that he had no right to rely upon his foreman's statement that the fumigant was not poisonous. We do not assent to this. Appellee was an illiterate employee and knew nothing of chemical gases and the effect of these fumigants. He knew they were discomforting and irritating, but this was not notice to him that they were poisonous. If he asked his foreman as to this and was assured to the contrary, he was not guilty of contributory negligence in continuing to work. The same principle applies to the doctrine of

assumed risk. There is no complaint of a defect in any of the articles with which appellee was working, nor were the premises rendered obviously dangerous by the other employees using gaseous compounds. So long as appellee was in ignorance of any danger arising therefrom, he could rely on the master furnishing him a safe place in which to work and rely upon the foreman's assurance of safety in reference thereto. Jellico Coal Co. v. Adkins, 197 Ky. 684, 247 S. W. 972; Log Mountain Coal Co. v. Crunkleton, 160 Ky. 202, 169 S. W. 692; Jellico Coal Mining Co. v. Walls, 160 Ky. 730, 170 S. W. 19; Thayer v. Kitchen, 145 Ky. 554, 140 S. W. 1052; L. H. & St. L. Ry. Co. v. Armstrong, 137 Ky. 146, 125 S. W. 276. True reference is made in these cases to a violation of the statute which barred the defense of assumed risk. They are, however, directly in point on the question of contributory negligence, and independent of statute the court cannot, as a matter of law, say under the facts of this case, that the injury was caused by assumed risk.

Appellant relies on the cases of Consolidated Coal Co. v. Hamilton, 170 Ky. 395, 186 S. W. 197; Webb v. Elkhorn Mining Corp., 198 Ky. 270, 248 S. W. 844; Nunnelley v. Prather, 157 Ky. 157, 162 S. W. 812; Oyen v. Willings, 183 Ky. 742, 210 S. W. 464; Wilson v. Chess & Wymond, 117 Ky. 567, 78 S. W. 453, 25 Ky. Law Rep. 1655; Hutchison v. Cohankus Mfg. Co. (Ky.) 112 S. W. 899; Kelly v. Barber Asphalt Co., 93 Ky. 363, 20 S. W. 271, 14 Ky. Law Rep. 356; L. & N. R. Co. v. Williams' Adm'r, 175 Ky. 679, 194 S. W. 920; Payne v. Blondell, 208 Ky. 122, 270 S. W. 725; L. & N. R. Co. v. Williams, 165 Ky. 386, 176 S. W. 1186, L. R. A. 1915E, 613; L. & N. R. Co. v. Sawyers, 169 Ky. 671, 184 S. W. 1123; Bollington v. L. & N. R. Co., 125 Ky. 186, 100 S. W. 850, 30 Ky. Law Rep. 1260, 8 L. R. A. (N. S.) 1045; Gosney v. L. & N. R. Co., 169 Ky. 323, 183 S. W. 538, L. R. A. 1916E, 458; Sandy Valley & Elkhorn Ry. Co. v. Tackitt, 167 Ky. 756, 181 S. W. 349, R. A. L. 1916D, 445. Even a casual examination of those cases shows that they can be distinguished from this one. In the Hamilton case plaintiff, an experienced miner, continued to work with a cutting machine which he knew to be defective and dangerous. In the Webb case plaintiff knew that the knives of the coal cutter were unguarded, and it was held that he was also bound to know that they would cut him if he came in contact with them.

In the Hutchison case plaintiff admitted that he knew of the danger. In the Prather case plaintiff procured a nail keg which turned with him while standing upon it. In the Willings case the employee's foot slipped while stepping over a rapidly revolving belt. In the Chess & Wymond case, Wilson, an employee, while standing upon an icy surface surrounding a boiling vat, fell and was scalded. In the Kelly case an employee bent over a revolving windlass, which caught his shirt and drew him forward. In the Williams case the employee voluntarily went upon a track in front of a moving train. In the Blondell case a passing train left a tunnel filled with smoke. The employee was one of a number of workmen engaged in inspecting the tunnel. They entered the tunnel on a motor-propelled car, carrying a scaffold, shortly after the train passed. The employee had a fit of coughing, caused by the smoke and gas, but remained, thinking it would soon pass away, and claimed that he was seriously injured thereby. The employee admitted that he voluntarily entered the tunnel and did not claim that any agents of defendant directed him to remain. In the other Williams case a laborer became overheated, as he claims, by reason of having an inadequate number of helpers, but the court said that the amount of work that he could do was known to himself, and this was followed in the Sawyers case. In the Tackitt case an employee strained himself while operating a jack. In the Bollington case the employee, 19 years of age, lost an eye while slacking lime. The court held that mixing water and lime for whitewash was such a commonplace transaction that any one 19 years of age and of ordinary intelligence ought to and did understand its effect; all of these cases turning upon the obvious danger which confronted the employee.

It is argued, however, that, even though the foreman assured appellee that the fumigants were not poisonous, this was not a continuing assurance of safety, and he could not rely upon it, if after a reasonable time he continued to suffer from the effects of the fumigants. That principle is frequently applied to a failure to repair defective machinery upon request. In such a case the employee knows of the danger; if he complains and is promised that the defect will be repaired, he may rely upon this for a reasonable length of time; if the master fails, however, for an unreasonable length of time to make such

repairs, and the servant continues thereafter to labor, he will assume the risk. But this case is different. Where a servant conscious of discomfort, but unaware of danger, asks his foreman in reference to the use of chemical gases at his place of work and is assured that they are harmless, this is a continuing assurance of an existing fact, not a promise to remedy a defect.

There is some criticism of the instructions, but we find no merit in this.

Wherefore, perceiving no error, the judgment is affirmed.