## Tucker's Adm'r v. Louisville & N. R. Co.

April 18, 1939.

Joseph H. Hancock, Judge.

LAWRENCE S. GRAUMAN and THOMAS W. BEALE for appellant.

WOODWARD, DAWSON & HOBSON and H. T. LIVELY for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE RATLIFF—Affirming.

On June 30, 1936, and for some time previous thereto, appellant's decedent, Arvey N. Tucker, was employed by appellee as a coach carpenter or repairer in its shops in Louisville, Kentucky. For several months preceding the date of the alleged injury of decedent which resulted in his death, he, with other employees, had been engaged in the over-hauling and air-conditioning of certain passenger coaches. It appears that it was the custom that when the air-conditioning was near completion, the plumbers would turn steam into the coaches to test the heating apparatus and this was done while the workmen were at work on the inside of the coaches, as was decedent and other workmen on the day he received his injury, which was on June 30, 1936. On that day the temperature on the outside ranged between ninety and 100 degrees, and, in accordance with the usual custom steam was turned into the coach for a few minutes to test the valves. About the time or, accord-

ing to the evidence of some of the witnesses, previous to the time the steam was turned into the coach, decedent complained of getting too warm and having a headache. In order to have the coach ready for service as soon as possible other workmen who were engaged in the same work with decedent worked overtime, but decedent said he was not feeling well and quit work at the expiration of the usual or regular hours and went home. His condition continued to grow worse and he died on July 3rd, 1936. The medical evidence is more or less conflicting as to the cause of decedent's death but there is considerable evidence to the effect that he died as result of a cerebral hemorrhage caused by over-heat.

Appellant was appointed administratrix of decedent's estate and brought this suit against appellee under the Federal Employers' Liability Act, 45 U. S. C. A., sections 51-59, to recover for her decedent's death upon the ground that it was caused by appellee's negligence in turning the steam into the coach without warning to the decedent. The original petition alleges that the coach in which decedent was working at the time he received his injury had been in use in interstate commerce before it was repaired, and immediately put back into that service after its repair. It was stipulated in substance that the coach in question went into appellee's shop for repair on April 24, 1936, and was released from the shops on July 1st, 1936, and between those dates it was not used in any kind of commerce, but before April 24, 1936, and after June 30, 1936, it was operated by appellee in interstate commerce.

Appellee answered denying certain material allegations of the petition, including the one relating to the use of the coach in interstate commerce, and affirmatively pleaded contributory negligence and assumed risk. At the close of plaintiff's evidence counsel for appellee entered motion for a directed verdict in its favor and the court indicated that it was inclined to sustain the motion but permitted appellant to file an amended petition withdrawing the action from the provisions of the Federal Employers' Liability Act and proceeding with it under the state law. After the amended petition was filed appellee renewed its motion for a directed verdict which the court sustained and directed the jury to return a verdict for appellee upon the grounds of assumed risk and from the judgment entered upon that verdict appellant has prosecuted this appeal.

If the court properly directed a verdict for appellee upon the grounds of assumed risk it is not material whether the action should or might have been prosecuted under the provisions of the Federal Employers' Liability Act, hence he will first consider the evidence on the issue of assumed risk.

Clarence Isenberg, assistant foreman in the coach department, testified that decedent worked under him as coach carpenter and no direct complaint was made to him about the plumbers turning the heat into the cars while the carpenters were working therein, although he had heard the men complaining about it being hot in the cars; at about ten or eleven o'clock A. M., June 30th, the witness passed through the coach where decedent was working and decedent said he came very near getting too hot and the witness said to decedent, "Don't you know enough to get out of the car when you get too hot, and cool a little." He said that that day (June 30) was an extremely hot day and some of the car windows were open and some were closed. He said that the air-conditioning of the coaches had been going on for about five months and the same practice had been followed in each car that had been air-conditioned, which he estimated to be about 18 cars and decedent had worked on each of them and had done the same kind of work under the same practice and condition and, decedent and all the men working in the car knew that steam was turned on. In answer to the direct question as to how they would know the heat was turned on, he said, "Well, of course, anybody knows that heating apparatus, when you first turn the steam on, that expands—expansion takes place, and it makes a lot of noise and cracks and pops."; that he, witness, always heard the popping and cracking when the team was turned on, although his hearing was not very good. The witness was asked what was the practice and custom of all the men in the trim gang (meaning carpenters inside the car) with reference to whether they would stay in the car, or stay in any place where they were working, if it got too hot.

"A. Well, they would use their own discretion about that. If they would get too warm they would go outside, get a drink, and cool off.

"Q. Did all of them, including Mr. Tucker (decedent) know that? A. Yes, sir."

Albert Haag, foreman in appellee's pipe shop and

in charge of the plumbers, testified that no complaint was made to him about the plumbers turning on the heat in the coaches while the carpenters were working.

James B. Welch, Sr., who was working in the same car with decedent, testified that steam was turned on regularly to test the heating system of cars while men were working on them and they made complaint about it and that the only objection he had to the heat being turned on was that the burning of the paint from the pipes would get in their eyes and "we would merely object to them turning the steam on while we were in the cars," although the steam would increase the temperature inside the car from ten to fifteen degrees; that he was working with decedent on June 30, but did not hear him make any complaint to Mr. Isenberg; that decedent complained of feeling bad at about noon but at that time the temperature in the car was down to about 60 degrees. He further said that there was no difficulty in telling when the steam was on because of the smell of new paint being burned off and the cracking noise made by the pipes and that anybody could tell it, and that it was the usual practice that had been followed in air-conditioning of all the cars for six months or more and that decedent knew it.

Earl Otis, another fellow workman of decedent, testified that they complained to the plumbers about turning the heat into the car while the carpenters were working but they did not get any satisfaction; that they never talked to the foreman about the heat "but just ordinary men." Upon being asked what period of time this practice continued, the witness said that it had been a regular thing since he had been employed by the company in that department and is still that way.

A. G. Calloway, who worked with decedent and was the representative of the shopmen, testified that there was a general complaint about the plumbers turning the heat in the coaches while the carpenters were at work and he talked to his foreman, Isenberg, about it and then took the matter up with Haag, who told him it would not happen any more. There is also evidence that the promise to desist in the practice of turning the heat on while the men were at work in the coaches was communicated to decedent. However, it appears that this was before June 30.

James Sells, who worked in the crew with decedent,

testified that before noon on June 30, decedent said that he felt like he got a little too hot but this was before the steam was turned on, and the decedent went out and cooled off a while.

Ed. Ballard who was working in the same coach with decedent, on June 30, testified that decedent had worked continuously with that crew in the same work during each day while the coaches were being worked on and during that time the steam was put into the coaches every day.

In brief for appellant, and the record as a whole, appellant's case is bottomed upon the sole theory or principle that decedent's illness and .death was caused by the turning of the heat into the coaches while he was working therein and the only negligence attempted to be proved or relied on is that the steam or heat was turned into the coach where decedent was working after he had made complaint about it and had been informed that that practice would be stopped. However, under the issue of assumed risk, these facts of themselves are not sufficient to warrant a recovery in the absence of some evidence tending to show that decedent was not aware of the fact that the practice of turning steam or heat into the coaches while he was working therein had not been stopped. Or, stated differently, if it be conceded that it was negligence on the part of appellee's foreman or others in charge of the plumbing department, to turn the heat into the coach while the carpenters, including decedent, were working therein, and after complaint was made concerning that practice the foreman promised that it would be stopped, yet, the burden was on plaintiff to show that decedent relied on the promise and did not know that they were continuing the practice of turning the heat into the coach where he was working. Thus it is seen that this case must be determined upon the question of knowledge of the decedent that the plumbers were continuing the practice of turning steam into the coaches at the time complained of, notwithstanding his complaint and information received that that practice would be stopped.

The evidence shows that other employees who were working with the decedent complained to the foreman about turning steam into the pipes while they were working in the coach and had received assurances that this practice would be stopped but it had not been stopped and. some of them testified that decedent knew

it had not been stopped even after he had received assurance that it would be stopped, and all the witnesses who testified on this point said that anyone would know when the steam was turned on in the coaches because of the noise, cracking of the pipes and also the odor of the burning of the fresh paint. One witness said he could not hear very well but the noise was plainly audible to him. While the witnesses who testified on this point were employees of appellee, yet they were called by appellant as her witnesses and no other evidence is offered in her behalf.

Among the authorities cited and relied on by appellant, is Louisville & Nashville Railroad Company v. Gilliland, 220 Ky. 431, 295 S. W. 422, 53 A. L. R. 386, where the railroad company was held liable for injuries resulting from inhaling fumes created by disinfectants used in cleaning coaches. Gilliland testified that on different occasions he had complained to his superior and was assured by him that the disinfectants were not poisonous and also testified that he knew nothing of chemicals and did not know that his system would be injured in any way by continuing to work. But it must not be overlooked that in the case at bar there is no complaint or contention that decedent continued to work in the coach because he was relying upon the assurance of his superior that the additional heat caused by the steam would not injure him or, that he was ignorant of the danger, or relied upon the judgment of his superior. We do not think the Gilliland case is applicable.

In Louisville & Nashville Railroad Company v. Sawyers, 169 Ky. 671, 184 S. W. 1123, 1124, speaking of the question of assumed risk, it is said:

"The only safe and practical rule is that each man is the best judge of his own physical strength and powers of endurance; that he knows better than any other can, when the limit has been reached, and when, in following his own instinct of self-preservation, he must desist and exercise his right under the law to give up his work if it is more than he can stand."

It is the undisputed evidence that decedent complained of being too hot on the day in question even before the steam was turned into the coach and went out and got a drink of water and cooled off awhile, and it is also shown that decedent and all the men working with

him had the privilege of retiring from the coach when it got too hot and it was left to them to exercise their own judgment in respect of their powers of endurance. If they failed to avail themselves of this method of self-preservation and continued to work with knowledge of the conditions complained of, they assumed the risk.

In Louisville & Nashville Railroad Company v. McCoy, 270 Ky. 603, 110 S. W. (2d) 433, 435, McCoy was a hostler employed by the railroad company and sued to recover for injuries resulting from being overcome by breathing carbon monoxide gas generated by water being thrown upon smoldering cinders. In reversing the judgment in favor of McCoy on the plea of assumed risk, the court said:

"This is not of the class of cases where the employee, at the command or direction of his superior, entered a dangerous place in order to do his work, and there can be no claim of any primary duty of obedience, or of any assurance of safety by one superior in authority. Nor can it be claimed the employee was given no opportunity to inspect the place. * * * The plaintiff assumed all the normal risks incidental to his employment which were known to him or which, *in the exercise of ordinary care,* were ascertainable. * * * The plaintiff assumed risks due to the negligence of his employer and fellow employees if they were obvious or fully known and appreciated by him. * * * This is not a case where an employee was exposed to an unusual or extraordinary condition or was called upon to meet a danger without having any means for ascertaining it." (Our italics.)

Also, in Louisville & Nashville Railroad Company v. Stewart's Adm'r, 207 Ky. 516, 269 S. W. 555, 556, a recovery was denied upon the grounds that Stewart continued to work in a place where the danger of being injured was obvious to a person of "even slight understanding."

From the evidence in the case at bar, viewed in the light of the authorities, supra, we find no escape from the conclusion that decedent knew, or, as said in the McCoy case, supra, could have known, in the exercise of ordinary care, that the turning of heat into the coach where he was working was being continued even after complaint was made and assurance given that it would

be stopped and, this condition existed on the day of the alleged injury. This being true, it follows that decedent assumed the consequences or risk of being injured by continuing to work under the known conditions.

These conclusions make it unnecessary to discuss or determine other questions raised. It follows, therefore, that the court did not err in directing a verdict in favor of appellee.

Judgment affirmed.