## T. M. Crutcher Dental Depot, Inc., v. Miller et al.

(Decided June 23, 1933.)

(As Modified on Denial of Rehearing Nov. 21, 1933.)

202

WOODWARD, HAMILTON & HOBSON and WILBUR FIELDS for appellant.

HARRY L. HARGADON and HARGADON & McNALLY for appellees.

OPINION OF THE COURT BY CREAL, COMMISSIONER—
Affirming.

On January 8, 1932, Marshall R. Miller filed his application with the Workmen's Compensation Board against the T. M. Crutcher Dental Depot, a corporation, seeking to recover compensation for permanent, total disability which he alleged resulted from disease of the heart and lungs superinduced by the inhalation of chromic acid gas.

By answer, defendant, after a general denial of the pertinent allegations of the application, by way of a second paragraph pleaded the one-year statute of limitation (Ky. Stats. sec. 4914), and by a third paragraph affirmatively alleged that plaintiff's disability, if any, was due to heart trouble not caused by the inhalation of chromic acid gas. The evidence of a great many witnesses, including a number of experts in medicine, surgery, chemistry, etc., was taken by the respective parties.

On final hearing the Compensation Board by its award adjudged that plaintiff recover of defendant the sum of $15 per week for a period of 400 weeks, with interest on past-due payments and $100 for medical and hospital bills subject to a credit of $175.

As disclosed by the record, the pertinent facts are that appellee was employed by appellant in May, 1929, and was engaged in nickle plating and polishing until

the 18th day of October, 1930, when a chromium plating outfit was installed at appellant's plant. Appellee was placed in charge of it and did chromium plating until September, 1931, when, on account of impairment of health, he was forced to quit work.

The chromium plating outfit consists of an outer tank containing water which is kept during the process of plating at a temperature of about 110 Fahrenheit. Suspended in this is an inner tank in which is placed a chromic acid solution. The plating is done by causing a current of electricity to pass through the chromic acid solution from the positive pole, known as the anode, to the negative pole, known as the cathode, and in passing from one pole to the other the current carries the chromic acid in the solution and deposits it upon the article to be plated. Hydrogen gas arises from one of these poles and oxygen from the other. These gases are colorless and odorless, but it is disclosed by the evidence that in passing through the solution these gases will become charged or impregnated with other elements contained therein. The evidence shows that, while plating is being done, gases and vapors arise from the solution, and a blower is usually attached to the outfit to carry them off and to prevent their inhalation by the operator. A blower was not attached to this outfit until October 30, and there is evidence that after it was installed more or less of the gas would arise and be inhaled by the operator.

The evidence for appellee tends to establish that prior to the time he began to do the chromium plating he was a healthy, vigorous man, and had had little, if any, illness, but immediately after he started operating the plating outfit he experienced a burning sensation in the nose and throat from inhaling gases arising from the tank, and developed symptoms of a severe head cold, accompanied by nasal hemorrhages, for which he was treated by his family physician, Dr. Pectol. He did not yield to the treatment, and it was continued for several months. The doctor diagnosed his trouble as some bronchial affection. His gums and mouth became inflamed and infected, followed by loosening of the teeth. His joints became swollen, a condition which was followed by intense pains over the body. Appellee has been examined by a number of eminent physicians, and practically all of them agree that he was suf-

fering from a heart affection known as mitral stenosis. Some testified to a tubercular condition indicated by rales and other symptoms of lung trouble. There is evidence that a small portion of the liquid contents of the chromic vat at appellant's plant was analyzed by a chemist and found to contain zinc, tin, and traces of lead, and that an analysis of Miller's urine revealed the presence of these elements. The evidence of physicians indicated that in inhaling the gases from the plating tank these metals carried with the gas found their way into the blood stream, and resulted in the disabilities from which appellee is suffering. It is practically agreed that appellee had a bad case of pyorrhea. Some of the doctors attributed this to the inhalation of the gases, however, others take a contrary view, and some gave as their positive opinion that this trouble was of long standing and existed a number of years before appellee entered the employment of appellant.

Counsel for appellant make a vigorous attack upon the competency of the evidence as to the analysis of the fluid obtained from the chromium plating vat at appellant's plant and as to the competency of the other evidence, and it appears that there is real merit in their contention. This much is admitted in a comprehensive and well-written opinion by a member of the Compensation Board found in the record; however, as pointed out in that opinion there was sufficient competent evidence on which to base the conclusion that the disability of which appellee complained resulted from his inhalation of gas arising from the chromic acid tank, and on that proposition we find ourselves in agreement with the board. Wholly apart from the evidence complained of, there is competent, uncontradicted evidence that the gases arising from the chromic acid solution used in plating are dangerous and deadly, and that they attack and cause a breakdown of the tissues and result in sores of an aggravated type which are slow to heal, and there is also evidence that these sores are sources of infection and a fertile field for the propagation of germs.

Notwithstanding the opinion of some eminent specialist that appellee's condition was not and could not have been caused by his inhalation of gas, there is no escape from the conclusion that the finding of the board is amply sustained by competent evidence, and in such

circumstances we would not be authorized to disturb the judgment affirming the board's finding merely because some incompetent evidence may have been admitted on the hearing.

The conclusion that the board's finding that appellee's condition was caused by the inhalation of gases in the course of his employment is supported by the evidence brings us to a consideration of appellant's contention that appellee's injuries did not arise from accident, and that his disease, if in any way connected with his employment, was occupational, and therefore not compensable under the Workmen's Compensation Act. Section 4880, Kentucky Statutes, so far as pertinent, reads:

"This act * * * shall affect the liability of the employers subject thereto to their employees for personal injuries sustained by the employee by accident arising out of and in the course of his employment, or for death resulting from such accidental injury; provided, however, that personal injury by accident as herein defined shall not include disease except where the disease is the natural and direct result of a traumatic injury by accident, nor shall they include the result of a pre-existing disease but shall include injuries or death due to inhalation in mines of noxious gases or smoke, commonly known as 'bad air,' and also shall include the injuries or death due to the inhalation of any kind of gas."

That part of the quoted provision of section 4880 relating to the inhalation of any other kind of gases was inserted by way of amendment at the 1924 session of the General Assembly. Prior to that time the section contained no provision relating to the inhalation of gas.

In the case of Jellico Coal Co. v. Adkins, 197 Ky. 684, 247 S. W. 972, 974, decided February 13, 1923, the court had for consideration the case of an employee who had contracted endocarditis from impure air in a mine where he was employed. The court held that, by the act then in force, the Legislature did not intend to make occupational diseases compensable, but meant to restrict its provisions to such diseases as were the "natural and direct result of a traumatic injury by accident." After asserting that the construction of the

quoted phrase turned on a definition of the word "traumatic," the court said:

> "It will be observed that all of these definitions of 'trauma' and 'traumatic' imply the presence of physical force, and this is the generally accepted meaning of the word. Evidently the act implies that some external physical force actually directed against the body must occur in order to constitute traumatic injury by accident. * * * We therefore conclude that diseases of an employee, contracted in the course of his employment and arising out of it, occasioned by negligence of the employer, and not caused by traumatic injury, are not compensable under the act. * * *"

It will be noted that the amendment with respect to the inhalation of the gases was enacted at the first session of the Legislature following the decision in the Adkins Case. Unquestionably the Legislature by the amendment intended to extend·the scope of the act so as to bring within its provisions injuries not theretofore compensable. It is to be presumed the Legislature enacted this amendment with a full knowledge of the existing conditions of the common law and of statutes with respect to the subject-matter. In determining the effect and meaning of this amendatory act, the court with this presumption in mind may look to the historical setting, the public policy of the state, the condition of its laws, the objects to be promoted, and any other facts throwing light on the purpose and intention of the Legislature. Schultz v. Ohio County, 226 Ky. 633, 11 S. W. (2d) 702; Grimes v. Central Life Ins. Co., 172 Ky. 18, 188 S. W. 901; 25 R. C. L. 1029.

The Legislature had before it the statute proposed to be amended, and is presumed to have known of the construction placed upon it by the court in the Adkins Case; and, if it was only intended by the amendment to make injury or death due to inhalation of any kind of gas compensable where it was the natural and direct result of traumatic injury by accident, then its adoption was a vain and useless gesture, since, under the original act as construed by this court, injury or disease so incurred was already compensable.

While the language of the act as amended leaves little, if any, doubt as to its meaning and purpose, it

would be the duty of the court, if it were ambiguous or of doubtful meaning, to give a liberal construction in favor of the employee. Great Atlantic & Pacific Tea Company v. Sexton, 242 Ky. 266, 46 S. W. (2d) 87 and cases therein cited.

With the language of the amendment and the foregoing and other equally well-established rules of construction as a guide, we are led to the conclusion that it was intended by the amendment to include within the provisions of the act injury or death due to the inhalation of any kind of gas in the course of employment without restriction or condition with respect to traumatic injury by accident.

In appellee's application for adjustment of his claim filed with the Workmen's Compensation Board on January 8, 1932, it is stated that he was injured on November 29, 1930. It is therefore urged by counsel for appellant that its plea of limitation should have been sustained. If proceedings before the Compensation Board are to be governed strictly by rules of common-law and Code pleading, there would be real merit in this contention.

Kentucky Statutes, sec. 4930, which is a part of the Compensation Act, provides in part:

"Processes and procedure under this act shall be as summary and simple as reasonably may be."

It is pointed out in Schneider on Workmen's Compensation Law, vol. 2, sec. 551, p. 1947, that since compensation acts usually contain the foregoing or similar provisions, the strict and technical rules of common-law and Code pleading are not as a general rule observed in proceedings before the compensation board.

In Kingston-Pocahontas Coal Company v. Maynard, 209 Ky. 431, 273 S. W. 34, 35, it is said:

"Although the application is the basis of the claim to be heard and tried out by the board, and therefore serves somewhat the same office in such a proceeding as does a petition in an action at law, its sufficiency is not to be determined by strict rules of pleading."

To the same effect, see Johnson et al. v. Hardy-Burlingham Mining Company, 205 Ky. 752, 266 S. W. 635, and the authorities therein cited. In the latter case it

is held in effect that when the steps taken by applicant for compensation substantially comply with the statutes and effectually protect the interests of the adverse parties, they will be upheld although not in strict conformity with the literal provisions of the statutes.

The application shows that the petitioner while acting in the course of his employment in operating the chromium plating device was required to work in such a manner as to cause him to inhale the gas arising therefrom which resulted in his health becoming impaired to such an extent that he was unable to continue his work after September 19, 1931. While the evidence shows that appellee first inhaled the gas about November 29, 1930, he continued to inhale such gas arising from the plater even after the blower was installed and until he finally quit work in September, 1931.

Applying the foregoing authorities to the facts and circumstances shown by the record, it is apparent that appellant's plea of limitation cannot be sustained.

Judgment affirmed.