RAMSEY *v.* BENDIX AVIATION CORP.

1. WORKMEN'S COMPENSATION—MEDICAL COMMISSION'S REPORT.
   The report of a medical commission appointed pursuant to the occupational disease amendment of the workmen's compensation act must be considered in its entirety (Act No. 10, pt. 7, § 6, Pub. Acts 1912 [1st Ex. Sess.], as added by Act No. 61, Pub. Acts 1937).

2. SAME—BRONCHIECTASIS—FINDING OF DEPARTMENT—EVIDENCE.
   Finding of the department of labor and industry that plaintiff's disabling bronchiectasis was due to irritation of his bronchial mucous membrane as a result of exposure to chromic-acid fumes in his employment *held*, supported by evidence (Act No. 10, pt. 7, § 2, Pub. Acts 1912 [1st Ex. Sess.], as added by Act No. 61, Pub. Acts 1937).

3. SAME—MEDICAL COMMISSION'S REPORT—CHROME ULCERATION OR ITS SEQUELAE OR CHROME POISONING—FINDING OF DEPARTMENT.
   A medical commission's report that plaintiff was not suffering from the compensable disease of "chrome ulceration or its *sequelae* or chrome poisoning" is not final and conclusive where its report also contains the statement that it could not "exclude the possibility that the bronchiectasis, which he is demonstrated to have, may be related to inhalation of irritant fumes," hence would not preclude the department from finding plaintiff's disability was due to "chrome ulceration or its *sequelae* or chrome poisoning" as of the date of disablement where medical commission's examination was made some four months later (Act No. 10, pt. 7, §§ 2, 6, Pub. Acts 1912 [1st Ex. Sess.], as added by Act No. 61, Pub. Acts 1937).

4. SAME—MEDICAL COMMISSION'S REPORT—EVIDENCE OF CONDITION OF PERSON.
   The report of a medical commission appointed pursuant to the occupational disease amendment of the workmen's compensation act is conclusive only as to the condition of the person examined at the time the examination is made (Act No. 10, pt. 7, § 6, Pub. Acts 1912 [1st Ex. Sess.], as added by Act No. 61, Pub. Acts 1937).

5. Same—Occupational Disease—Date of Disablement—Finding
   by Department.
   The liability of an employer under the occupational disease
   amendment of the workmen's compensation act is determined
   as of the date the employee was found to have been disabled
   by the department of labor and industry (Act No. 10, pt./7,
   § 7, Pub. Acts 1912 [1st Ex. Sess.], as added by Act No. 61,
   Pub. Acts 1937).

6. Same—Occupational Disease—Primary Irritation—Secondary
   Infection—Proximate Cause—Chromic Acid—Bronchiectasis
   with Associated Interstitial Pneumonitis.
   Under occupational disease amendment of the workmen's com-
   pensation act indicating an intent on the part of the legis-
   lature to provide compensation for disabilities "caused by
   * * * any process involving the use of or direct contact
   with chromic acid" where there was a direct causal connec-
   tion between plaintiff's work, involving direct contact with
   chromic-acid fumes or flakes which caused the primary irrita-
   tion of his lungs, or ulceration of his bronchial tract, and his
   resulting disability from bronchiectasis with associated inter-
   stitial pneumonitis, he was entitled to compensation (Act
   No. 10, pt. 7, Pub. Acts 1912 [1st Ex. Sess.], as added by
   Act No. 61, Pub. Acts 1937).

Appeal from Department of Labor and Industry.
Submitted January 11, 1946. (Docket No. 25, Cal-
endar No. 42,991.) Decided April 1, 1946.

Virgil Ramsey presented his claims for compen-
sation against Bendix Aviation Corporation, em-
ployer, and Fidelity & Casualty Company, insurer,
for disability due to occupational disease. Award
to plaintiff. Defendant appeals. Affirmed.

*Benjamin Marcus* and *Mathew M. Wolfe,* for
plaintiff.

*Alexander, McCaslin, Cholette & Buchanan,* for
defendant.

STARR, J.   Defendants appeal from an order of the department of labor and industry awarding plaintiff compensation for total disability under the occupational disease amendment of the workmen's compensation law.*

Plaintiff, who was about 30 years old, was employed by defendant Bendix Aviation Corporation from September 7, 1942, until July 8, 1943, when he was obliged to quit work because of disability from a respiratory disease.   He worked in defendant's chrome-plating room, where he was exposed to chromic-acid fumes and direct contact with chromic-acid flakes, until March, 1943, when he developed a skin irritation on the exposed parts of his body, which was diagnosed as "acute dermatitis venenata due to chromic acid."   On the advice of defendant's doctor who examined him, he was transferred to the heat-treat department, where his work was the immersing of airplane parts in a pot of molten lead. During his employment by defendant, plaintiff also developed a severe bronchial irritation, at times expectorated blood, lost considerable weight, and declined in health.   On June 12th, while pushing a truck in defendant's plant, he slipped and fell, injuring his chest.   He was treated by a doctor and returned to work.   On July 8th he was unable to continue work, and defendant's doctor sent him to a hospital for clinical examination.   His condition was diagnosed as "bronchiectasis with associated interstitial pneumonitis and a left lower pleurisy."

Thereafter plaintiff was unable to return to work and on August 27, 1943, filed claim for compensation

---

* Act No. 10, pt. 7, Pub. Acts 1912 (1st Ex. Sess.), as added by Act No. 61, Pub. Acts 1937 (Comp. Laws Supp. 1940, § 8485–1 et seq., Stat. Ann. 1942 Cum. Supp. § 17.220 et seq.).   (Later amended by Act No. 245, Pub. Acts 1943, and Act No. 318, Pub. Acts 1945 [Comp. Laws Supp. 1945, § 8485–1 et seq., Stat. Ann. 1945 Cum. Supp. § 17.220 et seq.].)

for accidental injury described as "fracture to rib bones, internal injuries and aggravation of pre-existing lung condition." On the same date he also filed claim for compensation under the occupational disease amendment, in which he alleged that he was suffering from "the disease known as lead poisoning or its *sequelae*; * * * chrome ulceration or its *sequelae* or chrome poisoning," that he had been exposed to chrome and lead compounds, and that the date of his last injurious exposure was July 8, 1943. At this point it should be noted that Act No. 245, Pub. Acts 1943, which amended the occupational disease statute, did not become effective until July 30th, which was subsequent to plaintiff's disability on July 8th. Defendant Bendix Corporation answered, denying that plaintiff had sustained an accidental injury and also denying that he had been exposed to chromic-acid fumes or that he had contracted an occupational disease. A medical commission was appointed,[*] and during the period from November 3 to 18, 1943, plaintiff was examined at the University hospital in Ann Arbor. In its report the commission stated that plaintiff was "not suffering from lead poisoning or its *sequelae*; * * * chrome ulceration or its *sequelae* or chrome poisoning." The report further stated, *"We cannot exclude the possibility that the bronchiectasis, which he is demonstrated to have, may be related to inhalation of irritant fumes."*

It was in effect agreed that plaintiff's two claims would be consolidated for hearing before the deputy commissioner. The deputy denied compensation for his alleged chest injury, but awarded him compensation for total disability from an "occupational disease listed as No. 2, lead poisoning or its *sequelae*

---

[*] Act No. 10, pt. 7, § 6, Pub. Acts 1912 (1st Ex. Sess.), as added by Act No. 61, Pub. Acts 1937 (Comp. Laws Supp. 1940, § 8485-6, Stat. Ann. 1945 Cum. Supp. § 17.225).

and/or No. 14 chrome ulceration or its *sequelae* or chrome poisoning and which resulted in bronchiectasis.'' On review, the department affirmed the deputy's finding that plaintiff's disability was not related to his accidental injury of June 12th. It also affirmed the deputy's award of compensation for total disability under the occupational disease amendment, with the exception that the department found that his disability was due to ''chrome ulceration or its *sequelae* or chrome poisoning'' and was not due to lead poisoning or its *sequelae*.

Plaintiff did not appeal from the order denying him compensation for his alleged chest injury. Having obtained leave, defendants appeal from the order awarding him compensation for total disability resulting from an occupational disease. They contend that he was not disabled by a disease compensable under the above-cited occupational disease amendment, which provided in part:

''SECTION 1. * * * (c) The term 'occupational disease' means a disease which is due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation, process or employment.

''SEC. 2. The disablement of an employee resulting from an occupational disease or condition described in the following schedule shall be treated as the happening of a personal injury by accident within the meaning of this act and the procedure and practice provided in this act shall apply to all proceedings under this part, except where specifically otherwise provided herein:

''Disabilities arising from * * * 14. Chrome ulceration or its *sequelae* or chrome poisoning * * * *caused by* * * * any process involving the use of or direct contact with chromic acid or bichromate of ammonium, potassium, or sodium or their preparations.''

Section 6 of the occupational disease amendment provides that the report of the medical commission "shall be final and conclusive as to the condition of said employee with respect to the alleged disease or diseases." Defendants claim that the department erred in awarding plaintiff compensation for an occupational disease, because the medical commission determined that he was not suffering from "chrome ulceration or its *sequelae* or chrome poisoning," which are the compensable diseases specified in the above statute. However, the commission's report must be considered in its entirety, including its statement that, "We cannot exclude the possibility that the bronchiectasis, which he is demonstrated to have, may be related to inhalation of irritant fumes." The evidence supports the following finding of fact by the department:

"He (plaintiff) was first employed by the defendant in its chrome plating room where he was exposed to the fumes of chromic acid and had direct contact with chromic acid flakes. On occasions he spit up blood because of irritation from the chromic acid fumes. He developed a chrome dermatitis and was removed from the chrome plating department to the heat treat department in April, 1943. He was losing weight during all of this period. * * * On July 8, 1943, he was examined by Dr. Burke who found him suffering from a bronchiectasis. He has not worked since and has been disabled by reason of such bronchiectasis.

"Chromic acid is a powerful irritant and has an affinity for mucous membrane which includes the linings of the lungs. Exposure to chromic acid fumes could irritate the bronchial mucous membrane placing it open to secondary infection and thereby set up a bronchiectasis. There is no ques-

tion in our minds but that this is what happened in this case.   We find that the plaintiff's disabling bronchiectasis is due to irritation of his bronchial mucous membrane as a result of exposure to chromic acid fumes in his employment.''

In its opinion the department further stated:

''The medical commission's report recognizes the possibility which we have found to be the fact that the plaintiff's disability is due to irritation of his bronchial mucous membrane by chromic acid fumes. Its report is consistent, therefore, only if it conceives that disability resulting from such irritation is something different than 'chrome ulceration or its *sequelae* or chrome poisoning.' It is our opinion, however, that whatever may be the niceties of medical expression the question of whether or not disability arising from such irritation is a scheduled occupational disease within the meaning of the language used by the legislature is a legal question for this commission to determine. The law provides that 'chrome ulceration or its *sequelae* or chrome poisoning' is compensable when it is caused by 'any process involving the use of or direct contact with chromic acid.' It is obvious that the intention of the legislature was to protect workers in the event of disability arising from any process involving the use of or direct contact with chromic acid. Insofar as this problem is concerned, the distinction between the *sequelae* of chromic irritation as we have it in this case, and 'chrome ulceration or its *sequelae* or chrome poisoning,' the language of the statute, is not a distinction that anyone other than a medical man, well versed in medical terminology, would be likely to make.   *   *   *   We believe that the disability which the plaintiff has is one which the legislature intended to include when it used the words 'chrome ulceration or its *sequelae* or chrome poisoning.'

"We, therefore, conclude that the plaintiff's disability resulting from irritation by chromic acid fumes was a scheduled occupational disease. * * *

"The award granting compensation under the occupational disease amendment is affirmed with the exception that we find that plaintiff's disability was due to 'chrome ulceration or its *sequelae* or chrome poisoning' and was not due in any way to lead poisoning or its *sequelae*."

Plaintiff, who had been in good health, had been a truck driver in Arkansas and had never worked in a factory until he came to Detroit and entered the employ of defendant Bendix Corporation. The testimony clearly indicates that his disablement resulted from his exposure to chromic-acid fumes and direct contact with chromic-acid flakes. He testified in part:

"The chromic acid was eating my soles up in my hose, and I had my face all broken out, eyelids were real thick, * * * and I was spitting up blood from the fumes of the acid. * * *

"When they would come down and check the acids to see how weak it was, I would fill the tanks up; sometimes I would have to put 500 pounds of chromic acid in, sometimes two, three, sometimes 900, * * * according to how much the acid was weak, and when I would fill that up with the raw flakes, the flakes would get inside, I would inhale them. I had to take a scoop and scoop it up, and the fumes would go down in my nose, and my nose would start bleeding * * * sometimes, and that night when I would go home I would * * * cough up blood."

In March, 1943, plaintiff developed an acute skin irritation, and defendant's first-aid department referred him to Dr. Cobane, a specialist in dermatology, who diagnosed his condition as follows:

"All surfaces of his face, ears, all surfaces of his neck, * * * dorsal surfaces of all fingers, dorsal surfaces of both hands, and all surfaces of both forearms to the rolled-sleeve level, are involved with erythematous, excoriated, pruritic, occasionally ulcerating, dermatitis. The clinical picture presented on his fingers, hands and forearms is a classical picture of chromic-acid dermatitis. There was no other dermopathology.

"The diagnosis in this case is acute dermatitis venenata due to chromic acid. Careful questioning concerning other irritants encountered while working and outside working hours elicited no other possible etiology. This is an occupational dermatitis and this man is entitled to medical care. It is absolutely necessary that his job be changed immediately, far away from any contact whatsoever with chromic acid fumes or parts that have been dipped in chromic acid."

Under Dr. Cobane's treatment plaintiff's dermatitis apparently cleared up. He was transferred to the heat-treat department and continued working there until July 8, 1943. His bronchial condition had become worse, and on that date defendant's first-aid department sent him to a doctor, who hospitalized him for examination. His condition was diagnosed as "bronchiectasis with associated interstitial pneumonitis and a left lower pleurisy." Plaintiff stated that when he attempted to return to work in defendant's plant subsequent to this examination, he was advised by the personnel manager that "the doctor told us you can't work now, and you never can. * * * We will try to fix up some kind of compensation."

In August, 1943, plaintiff was examined by Dr. Davis, who had made a special study of the effects of the inhalation of chromic-acid fumes. Dr. Davis testified in part:

"My interpretation at the time I examined the man, and confirmed by my examinations of subsequent consultations was that he had a chronic type of irritation of the bronchi and of some portions of the left part of the lung. * * * I think the pathology was actually an inflammatory, local inflammatory, type of effect, which is ordinarily designated as a pneumonitis, which rendered part of the lung tissue incapable of functioning normally and accentuated the already existing bronchial inflammatory condition. * * *

"Q. * * * Now, doctor, in your opinion could there be any relationship between the fact that this man worked in the chrome plating department, coming in contact with chromic acid and compounds of chromic acid, any relation between that and the situation in his lungs or the condition you found in his lungs and chest?

"A. Yes. * * *

"At the time of my examination, I considered the man was incapacitated for work. * * *

"He was underweight 25 pounds, had low blood pressure, had upper respiratory tract irritation, had large bronchial tubes, stasis in the bronchial tubes, a chronic bronchitis, leukocytosis of 12,000, low basal metabolism rate; he had general disability.

"X-ray examination showed peribronchiolar inflammation, chronic bronchitis, a bronchiectasis. * * *

"When examined there was found common symptoms of irritation from inhalation of irritating substances or fumes.

"Q. *Bronchiectasis is not chrome poisoning in itself, is it doctor?*

"A. *May be a result of chrome poisoning.*

"Q. *Bronchiectasis is not a chrome ulceration in itself, is it?*

"A. *No.*

"Q. *May it be a result of chrome ulceration?*

"A. *Yes.*

"*Q.* If it is shown that the plaintiff, Virgil Ramsey, was treated for chrome dermatitis, chrome acid dermatitis, would that then strengthen or weaken your opinion?

"*A.* Strengthen it.   *   *   *

"*Q.* Doctor, if it will be shown that following removal from the chrome plating department he came in contact with fumes from a lead pot, would these fumes from the lead pot act as a continued irritant?   *   *   *

"*A.* Yes, they could."

Dr. Weiser, who was called as a witness by defendants, testified in part:

"*Q.* Doctor, what is bronchiectasis?

"*A.* Bronchiectasis is a sacculation of a bronchus.

"*Q.* Will you explain that a little simpler, a sacculation?

"*A.* Well, it's a condition where the wall of the bronchus is broken down and dilates, and with it pushes aside the lung cells and generally makes a pocket which cannot be drained because the fluid lies in the bottom of the pocket somewhat immobile. *   *   *

"*Q.*   *   *   * Could a bronchiectasis   *   *   * be in any way associated with exposure to acid fumes?

"*A.* Yes, it could.

"*Q.* In what way?

"*A.* In this way: that the acid fumes could irritate the bronchial mucous membrane and put it open to secondary infection.   *   *   *

"*Q.*   *   *   * What value would you place upon a man's exposure to chromic acid and the part it could play in the production of bronchiectasis or in pneumonitis?

"*A.* If the chromic acid exposure is sufficiently strong to produce changes in the bronchial tube, if he gave histories in the skin where he developed ulcerations, then his bronchial tube is then open to secondary infection. The chromic acid, *per se,* will do nothing other than produce the ulceration at first. It is a superimposition of the infection on that ulcerated area where the chromic acid could play a part.

"*Q.* In other words, the chromic acid is sort of the spearhead and leaves the way open for the secondary infection?

"*A.* It is an escharotic (caustic), it is an irritant.

"*Q.* Are you familiar with the fact, as testified to by Dr. Cobane, * * * that chromic acid is one of the most powerful irritants?

"*A.* That is correct.

"*Q.* Even in low concentrations it might act quite decisively on the lung tissue, is that correct?

"*A.* That is correct."

The record of the University hospital relative to the examination of plaintiff stated in part:

"Final diagnosis: tubular bronchiectasis with chronic in[ter]stitial pneumonitis of left upper lobe (base) possibly on an initiative basis of chromic-acid fumes. * * *

"The bronchoscopic studies are compatible with bronchiectasis although it could be due to local injury of the bronchial mucosae by irritating fumes."

The statute hereinbefore quoted provides for compensation for the occupational diseases scheduled as "Chrome ulceration or its *sequelae* or chrome poisoning * * * caused by * * * any process involving the use of or direct contact with chromic acid." The medical commission's report that plaintiff was not suffering from the compensable disease of "chrome ulceration or its *se-*

*quelae* or chrome poisoning'' cannot be considered as final and conclusive in view of its further statement that ''we cannot exclude the possibility that the bronchiectasis, which he is demonstrated to have, may be related to inhalation of irritant fumes.'' In any event, the commission's report would be conclusive only as to plaintiff's condition at the time of the examination in November, 1943. He was disabled on July 8, 1943, and the liability of defendants should be determined as of that date.* *Smith* v. *Wilson Foundry & Machine Co.,* 296 Mich. 484.

The evidence shows that chromic acid is a ''powerful irritant'' and particularly irritating and damaging to mucous membrane. The chromic acid apparently created an irritated or ulcerated condition of the mucous membrane of plaintiff's bronchial tubes, and the resulting secondary infection constituted the bronchiectasis and interstitial pneumonitis with which he was suffering. The statute indicates a legislative intent to provide compensation for disabilities ''caused by * * * any process involving the use of or direct contact with chromic acid.'' The record is convincing that plaintiff's disablement resulted from his work in defendant's plant, which involved the use of or direct contact with chromic acid. Whether he was suffering from the scheduled disease of ''chrome ulceration or its *sequelae* or chrome poisoning,'' or suffering from bronchiectasis with interstitial pneumonitis, appears to be largely a question as to what particular terms different members of the medical profession might apply to the diseased condition of his respiratory tract.

As a result of his contact with chromic acid, plaintiff's bronchial tubes became irritated or ul-

* See Act No. 10, pt. 7, § 7, Pub. Acts 1912 (1st Ex. Sess.), as added by Act No. 61, Pub. Acts 1937 (Comp. Laws Supp. 1940, § 8485-7, Stat. Ann. 1945 Cum. Supp. § 27.226).—REPORTER.

cerated, and, had that condition remained constant, the diagnosis would undoubtedly have been the compensable disease of chrome ulceration or its *sequelae* or chrome poisoning. However, the irritation or ulceration apparently created a fertile field for secondary infection, which resulted in a condition diagnosed as bronchiectasis with associated interstitial pneumonitis. Dr. Davis testified that while bronchiectasis is not chrome poisoning, it may be a result of chrome poisoning. He further said that bronchiectasis is not a chrome ulceration, but may be the result of chrome ulceration. Dr. Weiser said that chromic-acid fumes could irritate the bronchial mucous membrane and leave it open to secondary infection.

In any event, plaintiff's disablement was caused by chromic-acid fumes or contact with chromic-acid flakes, and whether the resultant condition of his bronchial tubes was called chrome ulceration or its *sequelae* or chrome poisoning, or whether it was called bronchiectasis with associated interstitial pneumonitis, would seem to be quite immaterial. There was a direct causal connection between the primary irritation or ulceration of his bronchial tract and his resulting disability. The record supports the department's award of compensation. The award is affirmed with costs to plaintiff.

It should be noted that this opinion is not in conflict with our decision in *Dation* v. *Ford Motor Co.*, *ante*, 152, because in that case the plaintiff terminated his employment subsequent to the effective date of Act No. 245, Pub. Acts 1943, which amended the occupational disease statute, while in the present case plaintiff's disability occurred prior to the effective date of this amendment.

BUTZEL, C. J., and CARR, BUSHNELL, SHARPE, BOYLES, REID, and NORTH, JJ., concurred.