ROSCOE LA VERNE EVINGER, (Plaintiff) Respondent, v. GUY A. THOMPSON, Trustee, Missouri Pacific Railroad Company, a Corporation, (Defendant) Appellant, No. 43634—265 S. W. (2d) 726.

Court en Banc, March 8, 1954.

*Harold L. Harvey* and *Donald B. Sommers* for appellant.

662

*John H. Haley, Jr., Guy W. Green* and *Trusty, Pugh & Green* for respondent.

HYDE, P. J.—Action under Federal Employers' Liability Act (45 U.S.C.A. 51) for damages for dermatitis, claimed to have been caused by contact with sodium bichromate, used by defendant as a rust inhibitor in the cooling system of its diesel engines. Plaintiff had a verdict for $35,000.00 and defendant has appealed from the judgment entered.

Defendant contends it was entitled to a directed verdict; and the principal question, therefore, is whether defendant was negligent in using the compound (containing chrome) without determining that

it could cause harm to some of its employees, warning them or using protective measures. Plaintiff was a machinist doing inspection and repair work at defendant's roundhouse in Osawatomie, Kansas. He had worked on steam engines for many years and in May 1948 went to work exclusively on diesels. He had never had any skin trouble before that time. Defendant began using the rust inhibitor in its diesels early in 1945, made from a product blended by the Dearborn Chemical Company of Chicago called Dearborn Compound No. 517, containing 60 to 70 per cent sodium bichromate. It was a yellow powder; three pounds of it was mixed with 100 gallons of water and the solution put in the radiators of the diesels by laborers. When there were radiator leaks a dried yellow deposit would be left on the machinery, floors and walls of the diesel and when the radiators were drained such deposits would be left on the floor of the shop and on the trucks of the diesels. When a cylinder head leaked there would be a yellow residue in the grease around the exhaust stacks and it would also get into the lubricating oil. Plaintiff changed water pumps, removed cylinders, replaced gaskets and other parts and made general repairs and adjustments. In this work, he would frequently come in contact with the yellow fluid or its dried residue. No one ever told plaintiff what the substance contained or gave him any warning about contact with it. Plaintiff also said the radiators were never flushed with clear water and that the diesels were not cleaned before he worked on them.

In November 1948, plaintiff noticed a breaking out and itching on the backs of his fingers. He gave it home treatment but it got worse so he went to Dr. Johnson of the Missouri Pacific Hospital Association in January 1949. His condition did not respond to treatment but got worse and Dr. Johnson advised him to lay off work, which he did from February 5th to March 5th. He returned to work, wearing rubber gloves on the advice of Dr. Johnson, but his hands became broken out and swollen as far as the gloves went on his wrists so he quit work on March 8th and went to another doctor. The breaking out ran up his arms and finally affected his arms, legs, face and body; and on March 19th, he was sent to the Association Hospital in St. Louis, where he stayed until April 1st. He tried to work again on May 23rd and on June 27th, after taking weekly treatments at the hospital, but broke out again on his hands and arms both times.

Plaintiff's medical evidence was that he had chrome dermatitis and that it was caused by coming in contact with the sodium bichromate solution used in the diesels, and its deposits on and around them, during his work. Patch tests made on plaintiff's skin with these deposits showed that they would cause him to have this type of dermatitis. Plaintiff's evidence also was that chrome dermatitis was considered an occupational disease; that it had been known to the medical profession for more than fifty years and that about 20%

of the persons exposed to it are affected by it. (One doctor said 27%; defendant's evidence was about 2%.) The form in which the chrome substance is found was said to be immaterial, since the sensitivity is to the chrome itself rather than to the bichromate. Chrome dermatitis has been found in connection with tanneries, woolen mills, furriers, air-conditioning plants, automobile factories, aircraft plants, blueprinting, shoe factories, lithographing, printing, glue making, and many other industries. Plaintiff offered to prove that other employees, working with him on the diesels, also got the same kind of dermatitis but this offer was denied. It was also stated that chromium compounds have a toxic effect and are skin irritants; but that a considerable period of exposure is required to result in dermatitis from contact with chrome. Therefore, it was conceded that a pre-employment test could not determine sensitivity to it. One doctor testified, concerning the nature of plaintiff's ailment, as follows:

"Q. Would you classify this dermatitis as an allergy, so far as Mr. Evinger was concerned?

"A. Well, that is a very difficult question to answer. It is not the usual type of rash that we consider allergy. What we usually consider 'contact dermatitis'. There is a very fine point of distinction between the two.

"Q. Can you make that distinction?

"A. I will try. Allergy, we usually consider that when a person reacts violently to certain materials which the ordinary person does not react to. Contact dermatitis, we usually consider that the material is irritating to the skin in all people and that it is a question of the degree of exposure which determines the degree of dermatitis."

Defendant's evidence showed that plaintiff had the first case of dermatitis after they began to use the sodium bichromate compound. Its use was recommended by the manufacturer of the diesels. It was purchased as a packaged article by trade name. Prior to 1949 the Dearborn Chemical Company never issued any warning as to the use of the compound, but began in January 1949 to stencil a warning on all containers. Defendant did not begin regular use of diesels at Osawatomie until November 1947 and first put on three shifts to service them in May 1948 when plaintiff started on that work. Defendant's engineer of tests knew approximately the chemical quantities of the compound and knew that sodium bichromate was toxic or poisonous but considered it to have that effect only if taken internally. Defendant's witness Dr. Edmund N. Walsh (author of an article in the Journal of the American Medical Association of November 17, 1951 on dermatitis resulting from contact with chromate in cooling water of diesels) testified that sodium bichromate is not a primary irritant (irritant to everyone) and that chrome dermatitis is the result of an allergy; that is a different reaction to the material than that of the usual or average individual. He said that

sodium bichromate was a powerful skin irritant in certain concentrations but that the amount in the Dearborn compound would not be an irritant to all persons. He also said that chromates were a definite industrial hazard and that their effects were known in the 19th Century. He gave his opinion that plaintiff probably had chrome dermatitis. Defendant's witness Dr. Gerald V. Stryker gave his opinion that plaintiff's rash was the result of absorption by his system of a fungus infection, of which he found evidence, and not chrome dermatitis. It was also shown that plaintiff's original petition alleged contact with oil and grease as the cause of his dermatitis and that sodium bichromate was not mentioned until after the publication of the article by Dr. Walsh, when an amended. petition was filed. However, the hospital record of 1949 stated plaintiff's diagnosis as "contact dermatitis" with a notation that plaintiff "works in diesels and contacts numerous oils and greases and other chemicals"; and stated in October that plaintiff could return to work "providing he is transferred to some job which does not require his contact with oils, greases and chemicals."

Plaintiff takes the position that "a master can never escape being charged as a matter of law with knowledge of the nature of the constituents and general characteristics of substances used in his business unless no scientific information is available even to those having special acquaintance with the subject involved." Defendant says this rule could only apply to the use of inherently dangerous substances but does not apply to those from which there are only possible dangers; and is wholly inapplicable when the possible dangers are not to all persons but only to those peculiarly susceptible to the particular substance.

Defendant contends that plaintiff's condition was not the result of its negligence but of his own peculiar sensitivity or allergy. Defendant further contends that even if his condition did not result from allergy, nevertheless the evidence does not show it was negligent in failing to discover the harmful characteristics of the compound. Defendant says there must be some proof of notice to it, either actual or constructive of danger of harmful effects of the compound, which it says was not inherently dangerous; and that in constructive notice an employer is not charged with the knowledge of medical science but only with the knowledge of scientific facts possessed by men of . general education; citing M. T. Stevens & Sons Co. v. Daigneault, U.S.C.A. 1st, 4 F. (2d) 53; Grammer v. Mid-Continent Petroleum Corp., U.S.C.A. 10th, 71 F. (2d) 38; Allen v. Shell Petroleum Co., 68 P.(2d) 651; Russo v. Swift & Co., 286 N. W. 291; Koetsier v. Cargill Co., 217 N. W. 51; Waddell v. A. Guthrie & Co., U.S.C.A. 10th, 45 F. (2d) 977; McHugh v. National Lead Co., 60 F.S. 17, 19, 20; Marsanick v. Luechtefeld, (Mo. App.), 157 S. W. (2d) 537; and Lowden et al. v. Hanson, U.S.C.A. 8th, 134 F. (2d) 348.

While we think plaintiff's position is too extreme, we must hold that defendant's knowledge, actual or constructive, of the harmful characteristics of the sodium chromate compound was a jury question. It must be remembered that this is a case under the Federal Employers' Liability Act, and that the question of negligence under that Act is to be determined by the common law principles as established and applied in the Federal courts. (Urie v. Thompson, 337 U.S. 163, 69 S. Ct. 1018, 93 L. Ed. 1282.) The Urie case means that it was negligence, within the meaning of the Act, if defendant knew or by the exercise of due care should have known, that its standards of conduct (in the use of the compound) were inadequate to protect plaintiff and similarly situated employees. (69 S. Ct., l.c. 1028.) ▇▇▇ Furthermore, the Urie case definitely holds that an occupational disease is an "injury" within the meaning of that term as used in the Act.

It is true that the fact of silica dust (involved in the Urie case) being harmful was said to be a matter of common knowledge and that the employer was bound to know it. The harmful characteristics of the chromium compound, herein involved, are not a matter of common knowledge and plaintiff had the burden of proof to show that in the exercise of due care defendant should have known it. However, we think plaintiff had substantial evidence on that issue. (See Young v. Pennsylvania R. Co., U.S.C.A. (2d), 197 F. (2d) 727.) It was shown by plaintiff's evidence, and also by defendant's expert, that there was long experience and history as to the use of chrome compounds in industry and that considerable information was available on the subject. (See also 2 Gray's Attorneys' Text Book of Medicine 1519, Chapter 142, particularly Sec. 142.03.) Although defendant bought the compound from a reputable manufacturer as a packaged article under a trade name, it knew what was in it and knew it was toxic to some extent. (See 35 Am. Jur. 575, Sec. 144.) We think the number and variety of industries, in which chrome had been used and ill effects from it observed, shown by the evidence of both parties, has an important bearing upon the issue of constructive or imputed knowledge; and we think that situation distinguishes this case from those cited by defendant. It was at least a reasonable inference from the wide industrial experience with chrome that there was available information about it outside the medical profession, and it was shown that there were United States Government pamphlets on some phases of the subject as well as medical books.

It was said in 39 C. J. 492, Sec. 604, repeated in 56 C.J.S. 1050, Sec. 286, and cited in many cases: "With respect to the duty to warn employees of the hazards of the work, the master is charged with knowledge of the usual and ordinary dangers and hazards to which he is exposing his employees, and is bound to know the normal condition of his premises and to know of the nature of the constituents and general characteristics of the substances used in his business

670

so that he can give directions for the conduct thereof with ordinary safety to his servants performing the work with ordinary care; and particularly is the master chargeable with a knowledge of risks ascertainable only through a knowledge of scientific facts which an uneducated man is not presumed to know. The doctrine which imputes this knowledge to the master is called the doctrine of 'assumption of skill,' and for the purpose of determining this knowledge the law has a standard which does not vary with the actual capacity of the particular master, and consequently his ignorance is no excuse for a failure to warn.'' (See cases cited 56 C.J.S. 1050-1051, notes 20-23 on which plaintiff relies; for a very recent case see Mid-Continent Pipe Line Co. v. Price, 203 Okla. 626, 225 P. (2d) 176; see also annotation on employer's common law liability for occupational disease, 105 A.L.R. 80; Orr v. Shell Oil Co., 352 Mo. 288, 177 S. W. (2d) 608; Louisville & Nashville R. Co. v. Gilliland, (Ky.), 295 S. W. 422, 53 A.L.R. 386 and Annotation 53 A.L.R. 392.) While we agree with defendant that this principle is generally applicable to inherently dangerous substances (especially those likely to burn or explode), nevertheless it is well known that contact with many chemicals can produce harmful results and we think due care requires some investigation as to experience concerning those which have long been in use in industry; and that constructive knowledge is an issue for the jury when the evidence shows such a long and varied industrial experience as it does in this case.

As to defendant's contention concerning allergy, this was also a jury issue; and there was some evidence to show that anyone might be affected with sufficient long continued exposure. This evidence is in accord with the following statement about contact dermatitis from the Textbook on Medicine of Cecil & Loeb, p. 476: ''Although, quantitatively, there is a wide variation ▮▮▮ in the capacity of the skin of different persons to react, no one is considered immune, provided the epidermis is exposed sufficiently to repeated application of a known contactant.'' In any event, the evidence of experience in other industries at least showed that a very substantial per cent of those exposed to chrome compounds would be affected; and if defendant could reasonably foresee that a considerable number of its employees would be so affected, it would have the duty to exercise due care to prevent such injury. This principle has been applied in cases of liability of a manufacturer or seller to persons unusually susceptible to harm from the article or substance sold. (See Arnold v. May Dept. Stores Co., 337 Mo. 727, 85 S. W. (2d) 748; Annotation on Unusual Susceptibility to Injury, 26 A.L.R. (2d) 963, 973-979.) As stated in Gerkin v. Brown & Sehler Co., 177 Mich. 45, 143 N. W. 48, which we quoted and followed in Arnold v. May Dept. Stores Co., supra, (85 S. W. (2d), l.c. 753): ''When the fact is once established and demonstrated by experience that a certain commodity apparently

harmless contains concealed dangers, and when distributed to the public through the channels of trade and used for the purposes for which it was made and sold is sure to cause suffering to, and injure the health of, some innocent purchaser, even though the percentage of those injured be not large, a duty arises to and a responsibility rests upon the manufacturer and dealer with knowledge to the extent, at least, of warning the ignorant consumer or user of the existence of the hidden danger. * * * That the great majority of persons are safe from the particular danger concealed in the article sold, or that few injuries in fact result from its use, does not militate against this principle when the certain fact of imminent danger to a percentage is established." It was likewise held in Le Lenko v. Wilson H. Lee Co., (Conn.), 24 Atl. (2d) 253, (a Workmen's Compensation case) that an occupational disease need not be a usual and generally recognized incident of the employment (that is the usual result of the work) and, therefore, compensation would not be denied to a worker who contracted such a disease from his work because of his peculiar susceptibility to it. (See also 58 Am. Jur. 751, Sec. 248.) Even if this chrome compound was not dangerous to everyone, the evidence was sufficient to show that it could cause injury to a considerable number of those who came in daily contact with it and that, because of long experience with chrome substances in many industries, the jury could have reasonably found that defendant in the exercise of due care should have known of this danger to its employees. Our conclusion is that it was proper for the Court to submit the case to the jury.

Defendant alleges error in giving instructions 1, 2, and 14, at the request of plaintiff, and in refusing instruction D offered by it. Instruction 1 in six numbered paragraphs hypothesized the facts and authorized a verdict for plaintiff. Instruction 2 explained defendant's duty to exercise ordinary care to discover the nature and general characteristics of substances used in its business. Instruction 14 was on the measure of damages.

Paragraph 1 of instruction 1 told the jury that the Federal Act applied and "that under said law it was the duty of the defendant to exercise reasonable care to provide its employees with a safe place to work, and to warn employees of dangers in said employment and furnish them with the means of avoiding substances that are injurious to their health." Defendant says this abstract statement is too broad because latent and undiscoverable dangers are not excluded and it was not limited to dangers of which defendant had knowledge or by the exercise of reasonable care ought to have had knowledge. However, paragraph 3 of instruction 1 required the jury to find "that by the exercise of such ordinary care as ordinarily careful and prudent persons would ordinarily exercise under the same or similar circumstances for the reasonable safety of their employees in their

work, the defendant could or should have known and realized that such substance was reasonably likely to cause such harmful results to some of the employees so engaged in doing the work in question." Furthermore, ▆ instruction 3, given at the request of defendant, authorized a verdict for defendant upon a converse finding on this same proposition. Therefore, any indefinite, ambiguous, or misleading effect of the language in paragraph 1 of instruction 1 was clarified by the instructions read together and that was sufficient. (See Counts v. Thompson, 359 Mo. 485, 222 S. W. (2d) 487, 492 and cases cited.) Defendant also criticizes the last above quoted portion of paragraph 3 of instruction 1 as improperly stating the test of ordinary care because it did not submit the care usually exercised by persons engaged in the same kind of business, citing Canadian Northern R. Co. v. Senske, U.C.A. 8th, 201 F. 637. However, the discussion in that case was concerning an instruction offered by defendant and refused. Defendant requested no such instruction in this case and we think the submission in paragraph 3 of instruction 1 was sufficient. (See Tiller v. Atlantic Coast Line R. Co., 318 U. S. 54, 63 S. Ct. 444, l.c. 451, 87 L. Ed. 610.) Defendant further says that instruction 1 allowed the jury to speculate on the liability of defendant by not submitting every essential element necessary to establish negligence of defendant, citing Yates v. Manchester, 358 Mo. 894, 217 S. W. (2d) 541. What defendant says was omitted was the submission of any facts upon which the jury could base a finding that it should have had knowledge of any danger from the compound. Defendant overlooks the fact that this matter was further explained by instruction 2. Moreover, if defendant did not think this was fully covered by what was submitted in paragraph 3 of instruction 1, herein above quoted, and in instruction 2, it should have offered a clarifying or amplifying instruction. (Hooper v. Conrad, (Mo. Sup.), 260 S. W. (2d) 496.) We think the same thing is true of defendant's criticism of the use of the term "scientific knowledge" in instruction 2 as too broad; and we hold there was no prejudicial error in giving instructions 1 and 2.

▆ Defendant contends as to instruction 14 that it authorizes damages for physical disability and future loss of earnings without substantial evidence of either and does not limit past loss of earnings to the amount stated in the petition. We think the facts herein above stated show disability; even defendant's evidence shows that the work it claims plaintiff could do would be at a lower rate than that paid for his position as mechanic, which would mean some future loss of earnings. Furthermore, plaintiff's medical testimony was substantial evidence to show that his earning capacity had been reduced for sometime in the future. As to the amount of loss of past earnings stated in the petition, defendant claims that plaintiff's evidence shows more than that amount. Defendant's figures do not

seem to take into consideration the amounts plaintiff earned at farm work etc. during that period and the difference in time between the filing of the petition and the trial. However, since this evidence came in without objection, the petition could be considered as amended under Sec. 509.500 RSMo V.A.M.S. (See also Brown v. Terminal R. Assn., (Mo. App.), 164 S. W. (2d) 120, 124; Smyth v. Hertz Driv-Ur-Self Stations, (Mo. App.), 93 S. W. (2d) 56, 60.) We hold there was no prejudicial error in giving instruction 14.

██ Refused instruction D was as follows: "You are instructed that if you find and believe from the evidence that the dermatitis or other injuries, if any, which plaintiff suffered, was due to his own physical condition, sensitivity or allergy, and did not result in whole or in part from any negligent act or omission on the part of defendant, then your verdict must be for the defendant." While we think there was evidence to justify submission of the defense of allergy, this instruction was not a proper submission of it. An instruction was given on that defense in Arnold v. May Dept. Stores Co., supra, 85 S. W. (2d) l.c. 754, requiring a finding that the product used was not poisonous for the purpose for which it was used. There is no such finding required by this instruction. (See also Musgrave v. Great Falls Mfg. Co., 86 N. H. 375, 169 A. 583.) Certainly some finding as to the characteristics of the substance as well as the susceptibility of the ██ plaintiff would be necessary for a proper submission of the defense of allergy. Therefore, we hold that this instruction was properly refused.

██ Defendant also alleges error in admitting evidence of warnings as to the handling of the compound, Dearborn No. 517, issued subsequent to plaintiff's injury. This was shown on cross-examination of an officer of the Dearborn Chemical Company (warnings stenciled on the containers) and the time when this was begun was stated to be January 1949. This was before plaintiff's first lay-off from work so that it was within the period of time in the pleadings and the only objection was that it was not within that time. In any event, it was merely cumulative of similar evidence which had previously come in without objection. The Directing Chemist of the Dearborn Company had testified that there was a warning on the containers stating: "Caution Chemical Avoid Contact With Skin"; and that he did not know how long the company had been doing that. We, therefore, hold there was no prejudicial error in the admission of this evidence.

██ Defendant's final contention is that the verdict is excessive. Plaintiff was 49 years old at the time of the trial in October 1952. He had worked for defendant since 1918 with the exception of two years with another railroad. He had only a grade school education and had been a machinist since 1927. His life expectancy was 22.72 years. He earned $3600.00 in the year of 1948. In addition to his

hospital treatment in 1949 he had been treated at the hospital at least ten times in 1950 and five or six times in both 1951 and 1952. His condition had cleared some at times and then got worse. He had dermatitis on his arms, legs and neck at the time of the trial. The itching caused much discomfort and loss of sleep. He had done some farm work, putting up hay, building fences, digging ditches and other manual labor from which he earned from $450.00 to $550.00 in the three years before the trial. When he gets warm and sweats the dermatitis still breaks out, his hands swell and his face gets sore, sometimes so he cannot wear his glasses. Strangers shun him because of his skin condition. However, none of his doctors would say that his condition was permanent, although they were of the opinion that it would take a long time to clear up and did not know how long. They did say he could never be in contact with chrome substances without breaking out. One of plaintiff's doctors thought this would include metallic chrome, as used in furniture and automobile fittings, but on cross-examination he said he had never seen chrome dermatitis from that. Defendant offered plaintiff work as a car repair man which its evidence showed would eventually pay within four cents per hour of his machinist's pay. However, this would cause him to lose his seniority as a machinist and require him to start as a carman's helper. He could soon have been advanced to carman as there was no shortage of work in the car department. Plaintiff's transfer had the approval of the union chairman, but he did not accept any offers of work made by defendant, which also included work as an electrician's helper. One reason plaintiff did not accept was that the doctors who treated him at the hospital gave him the impression that oil and grease was the cause of his trouble. However, patch tests by plaintiff's doctors showed no reaction to oil. Plaintiff was also offered employment as a radio dispatcher for the Osawatomie Police Department but, after trying it, decided he could not handle the job. He has not attempted to get any regular employment, but has not resigned from the railroad and is still on the machinist's seniority roster with the right to go back to work.

We think the verdict was excessive because we cannot find that plaintiff had substantial evidence of total disability or that his dermatitis would be permanent. It does seem obvious that he could not continue the diesel work he had been doing, even with the new protective measures, because of the sensitivity to chrome which he has now developed. Thus his earning capacity has been impaired and he has had a ▮▮▮ considerable past loss of earnings, amounting to more than $12,000.00 at the time of the trial. However, "the law places upon a plaintiff the duty to act as an ordinarily prudent man to minimize avoidable consequences," as to earnings. (Phegley v. Graham, 358 Mo. 551, 215 S. W. (2d) 499, 505.) Plaintiff cites Abernathy v. St. Louis-San Francisco Railway Co., (Mo. Sup.), 237 S. W. (2d)

161; Timmerman v. T.R.R.A., 362 Mo. 280, 241 S. W. (2d) 477; Dempsey v. Thompson, (Mo. Sup.), 251 S. W. (2d) 42; Douglas v. Twenter, (Mo. Sup.), 259 S. W. (2d) 353. These are not comparable cases, the first three involved serious vertebral injuries and the last one was a case of disfiguring facial injuries to a woman, including permanent nerve and muscle injuries resulting in inability to taste, eat or swallow. The nearest case to this one we know of is Orr v. Shell Oil Co., 352 Mo. 288, 177 S. W. (2d) 608. In that case, the plaintiff got a rash, from working with a chemical, which finally covered his entire body, and he also suffered a permanent, chronic nephritis, an inflammation of the kidneys also known as Bright's Disease. Plaintiff herein said his kidneys were affected some but that this was a part of his nervous condition resulting from discomfort from the dermatitis. He did not have any kidney condition as serious as Bright's Disease, but his dermatitis apparently is much longer lasting and more persistent than was true in the Orr case. In that case, the trial court reduced a verdict of $40,000.00 to $20,000.00. We said the original verdict was excessive but refused to further reduce it. In view of the decrease of the value of the dollar since the time of the Orr case, although the injuries in that case seem to have been more disabling, we think a larger verdict can be sustained. Our conclusion is that the maximum amount that can be sustained in this case is $25,000.00.

Therefore, if within fifteen days plaintiff will enter here a remittitur of $10,000.00, the judgment will be affirmed for $25,000.00 as of the date of the judgment of the trial court. Otherwise, the judgment will be reversed and the case remanded for a new trial. Opinion of *Hyde, J.*, adopted, in accordance with Per Curiam filed.

■ PER CURIAM.—Defendant in a new brief filed in Banc makes three additional allegations of error. The first is: "There was no competent evidence of experience of other industries." Defendant claims that what was said about this was hearsay because of references in the testimony to medical textbooks and articles. This is really a renewal of defendant's original contention that the only knowledge shown, as to harmful consequences of the use of chrome substances, was the knowledge of the medical profession. However, what we held was that the evidence of both parties showed a wide industrial experience with chrome and that there was information available about it outside the medical profession. It certainly makes no difference that much of the testimony about industrial experience came from medical men; in fact, they had knowledge of it because of results of the industrial experience with it. Plaintiff's supplemental brief cites the following cases involving chrome disability, showing the year in which they were decided, namely: Repka v. Fedders Mfg. Co., 264 N. Y. 538, 191 N. E. 553 (1933); T. M. Crutcher Dental Depot, Inc., v. Miller, 251 Ky. 201, 64 S. W. (2d) 466 (1933); Sutkowski v. Mut. Chem.

Co. of America, 115 N.J.L. 53, 178 Atl. 71 (1935) ; Cell v. Yale & Towne Mfg. Co., 281 Mich. 564, 275 N.W. 250 (1937) ; National Products Refining Co. v. Court of Common Pleas, 123 N.J.L. 522, 10 A. (2d) 148 (1940) ; Shoemaker v. Auto Lite Co., (Ohio App.), 41 N. E. (2d) 433 (1942) ; Ramsey v. Bendix Aviation Co., 314 Mich. 169, 22 N. W. (2d) 259 (1946). Plaintiff also cites workmen's compensation statutes recognizing chrome as a cause of occupational disease, as follows: Arkansas Statutes Annotated, 1947, Vol. 7, Sec. 81-1314, par. 5; Michigan Statutes Annotated 1945, Cum. Sup. 17.220; North Carolina General Statutes Recompiled 1950, Vol. 2c, Chap. 97-53, p. 294; Ohio General Code Sec. 1465-68(a), Baldwins ▮ 1953 Ohio Revised Code 4123.68. These cases and statutes indicate considerable industrial experience with chrome substances. We adhere to our ruling that there was a sufficient showing of industrial experience with chrome to make defendant's constructive knowledge of its harmful characteristics a jury question.

▮ Defendant's second allegation of error is: "The trial court erred in excluding relevant and material evidence pertinent to the experience of other industries." This assignment does not comply with our Rule 1.08(a) (3) because it fails to show what ruling of the court is claimed to be erroneous and why it is claimed to be wrong. Nor is there any citation of authority, leaving it to us to brief this point. In the argument, it is stated that part of the cross-examination of Mr. Wilkes of the Dearborn Company was excluded, which would have shown that this company had no experience of any adverse effects from the handling of this compound in its laboratory and that it had taken no precautions of any kind to protect its employees. The objection was that no similarity of conditions was shown. However, no offer of proof was made and there is no specific mention of this matter in the motion for new trial. (See Rule 3.23.) (It might be noted that Mr. Milnes of the Dearborn Company thereafter did testify: "We have no knowledge of it being injurious to any of our employees"; and that: "we consider it safe for employees * * * our men can handle it and spill it on them.") Defendant has not properly preserved or presented anything for appellate review.

▮ Defendant's third allegation of error is: "The trial court erred in refusing to give instruction A offered by defendant." This is good as an allegation of error but is defective under 108(a)(3) in failing to state any reason why this ruling was claimed to be wrong, namely, "the points relied on." However, because of the importance of this case in ruling matters of first impression, we consider the merits of this allegation of error. Instruction A was as follows: "You are instructed that if you find that the Dearborn anti-rust compound mentioned in evidence with which plaintiff, Roscoe LaVerne Evinger, came in contact in his work as a machinist at the shops of defendant, Guy A. Thompson, Trustee, at Osawatomie, Kansas, was not inherently

poisonous on body contact to an ordinary normal person, and if you find that plaintiff was sensitized to such substance, or possessed an innate sensitivity, idiosyncrasy or allergy to such substance, which caused him to suffer the dermatitis and other injuries, if any, mentioned in the evidence, and if you further find that defendant did not know that plaintiff was so sensitized to such substance, or of such innate sensitivity, idiosyncrasy or allergy, and that defendant would not have known thereof by the exercise of ordinary care, which is such care as a reasonably careful employer would exercise under the same circumstances, then your verdict must be for the defendant.'' The first required finding (''was not inherently poisonous on body contact to an ordinary normal person'') might be sufficient to supply the defect noted in our ruling on the refusal of instruction D. However, the Court was justified in refusing instruction A because of the first alternative (''if you find that plaintiff was sensitized to such substance'') which would have prejudicially confused the issue the jury was required to decide. Plaintiff's own claim was that he ''was sensitized to such substance'' but that he became sensitized by coming in continuous contact with it over a long period of time by reason of defendant's negligent handling of it. Plaintiff had evidence tending to show that anyone might be sensitized to it by sufficient exposure. (On the matter of allergy see Bianchi v. Denholm & McKay Co., Mass., 19 N. E. (2d) 697; Zirpola v. Adam Hat Stores, N. J., 41 Atl. (2d) 73.) Of course, defendant had evidence to the contrary but the trouble with this alternative in instruction A was that it authorized a verdict against plaintiff on an improper ground under the evidence.

We reaffirm our ruling that no prejudicial error in the trial was shown, but that the ■■■ verdict was excessive, requiring a remittitur in the amount of $10,000.00.

*Hollingsworth, Dalton, Leedy, Tipton, JJ.*, concur; *Conkling, C. J.*, dissents in separate opinion filed; *Ellison, J.*, dissents, and concurs in separate opinion of *Conkling, C. J.*

CONKLING, C. J. (dissenting)—With deference and with respect for the views of those who hold a contrary opinion, I find that after further study of this record and the cases relied on I am unable to agree with the principal opinion in two respects.

■■■ It is first my view that the trial court erred in refusing to give Instruction D, as follows: ''You are instructed that if you find and believe from the evidence that the dermatitis or other injuries, if any, which plaintiff suffered, was due to his own physical condition, sensitivity or allergy, and did not result in whole or in part from any negligent act or omission on the part of defendant, then your verdict must be for the defendant.''

The principal opinion correctly states that there was evidence to justify the submission of the defense of allergy, but further rules

that the refusal of instruction D was not reversible error because instruction D did not properly submit such defense, basing that ruling on Arnold v. May Dept. Stores Co., 337 Mo. 727, 85 S. W. (2) 748, l. c. 754, and Musgrave v. Great Falls Mfg. Co., 86 N. H. 375, 169 Atl. 583. It is my opinion that those cases do not support the ruling of the principal opinion in that respect.

In addition to requiring the jury to find as a fact from the evidence that plaintiff's injuries were due to his own sensitivity or allergy, instruction D required of the jury, as a basis for a verdict for defendant, the additional affirmative finding that plaintiff's injuries did not result, in *whole* or in *part*, from any negligent act or omission on the part of defendant. If the jury found those two things defendant was entitled to a verdict. That was defendant's theory of the case, which it was entitled to have submitted to the jury. Inasmuch as there was testimony from which the jury could have found that plaintiff's injuries resulted from his personal allergy, I think that, irrespective of what plaintiff's evidence may otherwise have been, the defendant was entitled to have the jury instructed that if the jury so found, and further found that plaintiff's injuries did not result, in whole or in part, from any negligent act or omission of defendant, the verdict should be for defendant. Therefore, I do not agree with the ruling of the principal opinion that in this instruction "some finding as to the characteristics of the substance * * * would be necessary." For the error in refusing instruction D I would reverse and remand the judgment.

■■■■ It is my further view that even if the judgment appealed from is affirmed, that it should be conditioned upon the filing of a remittitur of $20,000. There is no evidence in this record that plaintiff sustained any permanent injury or total disability. Plaintiff has been able to and has performed manual labor. He has refused to minimize his damages, and loss of earnings. He would not accept the offers of employment made to him by defendant as a car repairer "which would eventually pay within four cents an hour of his machinist's pay." He declined defendant's offer of employment as an electrician's helper. He has declined other offers of employment. If plaintiff had minimized his damages, and the law places upon him the duty to act as an ordinarily prudent person to minimize avoidable consequences of his injury, he would not have had the loss of earnings as stated in the principal opinion. He has sustained no loss for medical attention or hospitalization. Under these circumstances it is my view that in no event should the judgment be permitted to stand for any sum in excess of $15,000.